LarAMORe, Judge,
delivered the opinion of the court:
This suit was originally two actions brought by plaintiffs to recover a sum of money which plaintiffs allege is due them under separate contracts with defendant’s National Capital Sesquicentennial Commission. These actions were consolidated for purposes of trial with the consent of the parties and pursuant to the court’s order of October 19, 1955.
Plaintiffs seek a money judgment against the United States basing their claim alternatively upon either the terms of a written unexecuted contract or on the reasonable value of the services rendered under letters of intent dated October *580 20, 1949. The defendant denies all liability and presents a counterclaim demanding return of all moneys previously paid.
The facts are summarized as follows: Late in 1946, at a Washington citizen’s meeting, a plan to sponsor legislation for an appropriate commemoration, in 1950, of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, was adopted. As a result of this meeting a committee was organized and they drafted a bill for congressional action. This bill led to the passing of a joint resolution by Congress, July 18,1947, creating the National Capital Sesquicentennial Commission. Section 4 of this resolution provided that the Commission should select an executive vice chairman and might employ a director. Pursuant to this section, Carter T. Barron was elected executive vice chairman, and became the chief administrative officer of the Commission. At the same time an executive committee was established and authorized to act for the Commission. In June 1948, Mr. Edward Boykin was appointed director. Proposed plans for a sesquicentennial celebration were studied and developed during 1948-1949, and many proposals were considered.
On June 25, 1948, Congress appropriated $15,000 for expenses necessary for the Commission to carry out a program of commemoration, and by a joint resolution of May 31, 1949, Congress authorized the Commission to proceed with plans for the celebration. No description of the celebration was specified.
In August 1948, George M. Rowland, vice president of plaintiff (Gardner), after reading an account of the proposed celebration in a New York newspaper, came to Washington, D.C., to see Mr. Boykin with regard to plans for the celebration. He was aware that no funds were available to compensate him for any services he might render, and he was cautioned that he was operating on his own, voluntarily, in soliciting business. Mr. Boykin did tell him that if any of his proposals were acceptable to the Commission, Boykin would recommend that Gardner receive a contract. At the same time Mr. Boykin informed Mr. Rowland that, as director, he had no authority to give Gardner any business.
*581 Director Boykin was in charge of the overall planning for the celebration. These plans were taken up individually, item-by-item, by the executive committee and most of them were approved. These original plans were known as Plan A. The plans that were approved were executed in connection with the sesquicentennial celebration and are not directly involved in this action. Subsequent plans to produce an exposition in the nature of a world’s fair, popularly called Freedom Fair, became part of Plan B. It is in connection with Plan B that activities lead to the litigation involved in the instant case.
The general theme of Freedom Fair was conceived by Gardner and it was presented to the Commission on April 15, 1949. However, expert advice with regard to accurate estimates and construction of Freedom Fair was required before any definite plans could be initiated. Minor Hudson, attorney for Gardner, and previously attorney for Byrne, suggested to Mr. Barron that Byrne be contacted for this purpose. Byrne agreed to volunteer services with the hope of eventually receiving a contract for architectural, engineering, and construction management services for Freedom Fair, when and if an adequate appropriation was obtained and the proposed fair became a reality.
On June 27, 1949, Byrne presented Mr. Barron with a budget of estimated cost and income expected from Freedom Fair:
Total Cost $17,888,750.
Advanced Requirements $15,112,500.
Income $20,875,000.
Profit $2,986,250.
A meeting of the commission was then held on June 28,1949, and these figures were presented. It was the opinion of the majority, including Carter Barron, that such an ambitious and extensive program should not be undertaken until firm commitments from industry were obtained to purchase sufficient exhibit space to make the project feasible. These commitments were never obtained.
Carter Barron was very enthusiastic about plans for Freedom Fair from the initial conception of the idea. He was so anxious to make the plans a reality that he preferred to make *582 such, progress as he could without taking up all matters with the commission.
From the very beginning the prospect of making Freedom Fair a reality encountered various legal difficulties, due mainly to the restrictive nature of the enabling legislation which created the Sesquicentennial Commission. Minor Hudson, a registered lobbyist for both plaintiffs and a legal advisor to Carter Barron, suggested that the only possible solution to the problems would be to form a private, nonprofit corporation, to plan, build, operate, and enter into the various contracts necessary to put on Freedom Fair. Consideration was given to a plan to have the legislation amended to include authority to form a non-profit corporation. Attorney James Howe, on loan from the "White House Staff, advised both Barron and Hudson that the formation of the proposed corporation was contrary to the Government Corporation Control Act, 59 Stat. 597, unless specifically authorized by Congress. He further advised them that the legislation passed on May 31, 1949, did not include this authority. Further, Mr. Howe strenuously objected to proposed contracts by Byrne and Gardner, as drafted by Minor Hudson. On August 23, 1949, by way of a memorandum addressed to Mr. Boykin, Howe submitted his objections to the proposed contracts, and he orally advised Barron that as executive vice chairman he had no statutory authority to execute such a contract.
In order to obtain an appropriation from Congress both Messrs. Barron and Boykin testified before the House Committee on Appropriations and the Senate Subcommittee of the Committee on Appropriations. Both men made it quite clear that only $600,000 of the requested $3,000,000 would be used for Plan A, and that the remainder would be a “capital prestige loan” to be used only after other income producing sources made the operation of the fair feasible.
On October 14,1949, Congress appropriated $3,000,000 for the Commission. Immediately after the appropriation was enacted, Minor Hudson prepared letters of intent addressed to his clients and delivered them to Mr. Barron for signature. On or about November 1, 1949, Carter Barron sent unsigned drafts of the letters of intent to Mr. Boykin to read *583 and return. Boykin discussed the matter with attorney Howe, who advised Boykin the letters of intent were out of order and that there was no authority to execute them. Boykin conferred with Carter Barron on a number of occasions about the letters, informing Barron that he (Barron) had no authority to execute them. These letters remained on Boykin’s desk approximately three or four weeks without signatures. Minor Hudson went to Boykin’s office and told the secretary that Carter Barron had requested that she retype the letters of intent in final form for his signature. She complied with this request. Later, these letters, dated October 20, 1949, were signed by Carter Barron.
Mr. Barron had neither requested nor received authority from the Commission to issue letters of intent to plaintiffs, nor did he notify the Commission of his intention to give letters of intent to plaintiffs.
In the meantime, on October 19,1949, Minor Hudson prepared a letter for Carter Barron to the Attorney General for an opinion as to whether the Commission had authority to form a non-profit corporation. He was informed of the Attorney General’s negative opinion on November 23, 1949, the same day he had the letters of intent retyped, but suggested a formal answer would not be necessary as he would withdraw the inquiry.
No meetings of the Commission or executive committee were held between June 28, 1949 and November 17, 1949. Shortly after the appropriations bill was passed by the Congress on October 14,1949 the chairman of the executive committee, Mr. McGarraghy, attempted to arrange an executive committee meeting, but was told by Mr. Boykin that there was nothing to present to the executive committee on which it might take action. However, a meeting of the executive committee was held on November 17, 1949, at which time, Walter Bastían was designated as general counsel for the Commission. Mr. McGarraghy requested at this meeting that a report be prepared for submission at the next meeting of the executive committee, on December 2, 1949, of all commitments made by the director and the executive vice chairman in behalf of the Commission. At the following meeting of the executive committee on December 2,1949, Mr. *584 Barron’s report on commitments was presented with the various letters of intent, including those to plaintiffs, Gardner and Byrne. The committee members had not previously seen or heard of the letters of intent signed on behalf of the Commission and all were surprised that Barron had taken these steps without approval. Neither the plaintiffs’ letters of intent nor their proposed contracts were affirmed or dis-affirmed by the executive committee at this meeting or at a prior or subsequent meeting of the executive committee or the Commission.
At the next executive committee meeting, December 9, 1949, details of the proposed contracts for plaintiffs and others receiving letters of intent were explained in detail, but action was deferred until another meeting of the executive committee to be held at a later date. At a subsequent meeting, held on December 16, 1949, Carter Barron again requested authority to execute the contracts. However, no action was taken regarding this request. Instead, the executive committee decided to recommend to the Commission at its next meeting, on December 30, 1949, that the opening of Freedom Fair be postponed until April 1951. The executive committee determined that it should review all existing commitments, and Director Boykin was instructed to temporarily defer all work on Freedom Fair pending this review. On January 3, 1950, Director Boykin sent notice to Byrne to “discontinue” all plans and specifications that plaintiff was working on as a result of the letter of intent dated October 20, 1949. Also, on January 5, 1950, he sent a letter ot Gardner to “hold up” on plans being worked on as a result of the October 20,1949, letter of intent.
On March 1, 1950, pursuant to a previous recommendation of the executive committee, Carter Barron was authorized to contact Paul Massman, to be employed as general manager of Freedom Fair, for the purpose of further exploring the feasibility of having the Fair. After being employed, Mr. Massman immediately abandoned the concept as had been presented by plaintiffs. However, plaintiffs did perform some additional services, including sketches of the new design and estimated costs.
*585 On March 1,1950, another opinion by the Attorney General was requested with respect to the authority of the Commission to grant to a non-profit corporation the rights and privileges necessary to enable such corporations to build and operate Freedom Fair. On May 4,1950, the Attorney General informed the Commission of the previous inquiry and advised that the Attorney General was of the same negative opinion. In view of this opinion, the executive committee, at a meeting May 10,1950, approved a recommendation that plans for Freedom Fair be abandoned. At the next meeting of the full Commission, held June 1, 1950, the plan to hold Freedom Fair was abandoned by the Commission. Thereafter, plaintiffs submitted their claims to the Commission, which, in turn, recommended to the General Accounting Office that claimants be allowed reasonable out-of-pocket expenses, as well as a reasonable percentage of profit. The General Accounting Office issued a settlement of claim notice on September 9, 1952, allowing Byrne the sum of $5,814.94; and on October 20,1952, allowed Gardner $4,138.46. Plaintiffs rejected the settlements and filed their petitions in this court. Plaintiff Byrne had received three payments from the Commission totaling $35,119.83. The defendant alleges these payments were made to Byrne under the mistaken belief the Commission had authorized these payments, and sues now to recover this amount by way of counterclaim.
Turning to their first contention, the facts in this case clearly indicate, and plaintiffs concede, that the definitive contract involved was never executed by the defendant or any agent of the defendant. As a general rule, the mere fact that the parties intend a subsequent contract to be made is evidence that they do not intend the previous negotiations to be binding. In the present fact situation it is clear the defendant never acceded to the terms of the definitive contract and, therefore, the defendant is not bound by the terms of the contract for the ob zious reason that future negotiations were required. Ship Construction Trading Co. v. United States, 91 Ct. Cl. 419, 456 (1940), cert. denied 312 U.S. 699.
Plaintiffs next contend they are entitled to recover an equal sum of money, measured not on the terms of the definitive non-executed contract, but measured as the reason *586 able value of tlieir services rendered by relying on letters of intent issued by the executive vice chairman of the Commission. Plaintiffs claim, and the court agrees, that it is clear from an examination of the legislation creating the Commission that Congress authorized the Commission to enter into contracts on behalf of the United States. But it does not follow that an agreement signed by an agent or officer of the Commission is binding on the Commission or the Government. Actually the converse is true. No officer of the Government has the power to bind the United States, in the absence of congressional authority. Whike Construction Company v. United States, 135 Ct. Cl. 126, 131 (1956). To hold a contrary result could conceivably create a situation where two collusive people could effect a drain of the public treasury. Since the early history of this court, it has been consistently held that the Government is not bound by the acts and declarations of its agent, unless it appears that he acted within the scope of his authority. Whiteside v. United States, 93 U.S. 247, 257 (1876). These cases conform with the basic principles of agency that one dealing with an agent must look to his authority. Persons dealing with the Government must take notice of the extent of the authority which the Government has given its agents. Hawkins v. United States, 96 U.S. 689 (1877); Riethmiller v. United States, 101 Ct. Cl. 495 (1944).
In Gay Street Corporation v. United States, 130 Ct. Cl. 341 (1955) this court reviewed a similar problem and stated at page 348:
The courts have consistently held that anyone entering into an agreement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. “And this is so even though * * * the agent himself may have been unaware of the limitations upon his authority.” Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384; Whiteside v. United States, 93 U.S. 247, 257; United States v. Holley, 199 F. 2d 575; Reconstruction Finance Corp v. Martin Dennis Co., 195 F. 2d 698.
In United States v. Willis, 164 F. 2d 453, the Circuit Court of Appeals held that one who deals with an agent of the Government must look to his authority, which will *587 not be presumed but must be established, and one who deals with such an agent cannot rely upon the scope of dealing or upon the apparent authority of such an agent.
This court held in Jacob Reed's Sons, Inc. v. United States, 60 C. Cls. 97, affirmed, 273 U.S. 200, and A. L. Ferguson v. United States, 60 C. Cls. 649, affirmed, 273 U.S. 660, that one dealing with the United States is bound to know and take notice of the limited authority of an officer with whom he was dealing and the court will not imply that such an officer was acting under proper authority.
Following the above authority, and considering all the facts in this case, we hold that Carter Barron was without authority when he issued “letters of intent” to the plaintiffs. Furthermore, the court concludes that this case is clearly not an instance where the Government agent was dealing with inexperienced persons against whom knowledge of the legal limitations upon Government officers should not be implied. Gay Street Corp. v. United States, supra. On the contrary, here we have experienced contractors who relied on the advice of a highly experienced lawyer, who had long dealt with Government contracts. Plaintiffs, admittedly, began as volunteers with the hope of obtaining a highly lucrative contract. When this contract did not materialize, they sought by way of a lawsuit to reduce the expenses they had incurred in attempting to induce the contract. The court as guardian of the public treasury does not turn a deaf ear to the demands of the plaintiffs but determines they are unwarranted.
Likewise, the argument urged upon us by the plaintiffs that the Government is estopped to deny the validity of the “letters of intent” must fail because we have determined the acts of the Government’s agent were unauthorized. It is an established proposition that estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government. Ship Construction & Trading Co. v. United States, supra. Nor can we ascertain any ratification of these agreements considering the actual circumstances in this case. The letters of intent were not actually signed by Carter *588 Barron, until November 23, 1949, and at the next meeting of the Commission, on December 2, 1949, this fact was disclosed. The Commission expressed surprise with the actions of Mr. Barron which were discussed and argued, but not ratified. The fact that his actions were not endorsed served as notice to the plaintiffs that the letters of intent were not ratified, the plaintiffs being very much aware of all proceedings by the Commission. This was positively shown by the record which establishes the fact that plaintiffs’ lawyer was also actively engaged in advising the executive vice chairman of the Commission.
Therefore, we hold that the plaintiffs were volunteers, their status never changed, and as such are not entitled to any further remuneration.
The defendant has urged the court to determine these letters of intent to be invalid on the ground that they were executed as the result of undue influence. Considering the conclusion we have reached there is no need to make such a determination.
The defendant’s counterclaim likewise must fail. The defendant does not deny that this money was expended pursuant to a plan that was intended to benefit the Government. Although the plan never became a reality, actual expenses were incurred in determining the feasibility of executing such a plan. Conceding that these expenses were incurred voluntarily until November 23, 1949, and further conceding that they were incurred as the result of unauthorized letters of intent until December 2, 1949, still a full month passed during which time the Commission was aware plaintiffs were incurring expenses. The Commission was informed, on December 2, 1949, that letters of intent had been issued. In spite of this intelligence, the Commission did not formally notify plaintiffs of a decision to cease work in process for over a month. Although we have determined that this delay did not amount to a ratification of the action of the executive vice chairman, nevertheless, in fairness to the plaintiff we think the parties should be placed substantially in the position they would have occupied without the attempted contract. New York Mail and Newspaper Transportation Company v. United States, 139 Ct. Cl. 751, 759 (1957). This can effec *589 tively be accomplished by denying defendant’s counterclaim. Moreover, as the amount of the counterclaim involved is substantially less than the amount expended, as determined by the Commissioner’s finding, and the Government did receive the benefit of the services involved, the ends of justice would best be served by leaving the parties in the same position their mutual actions placed them.
For these reasons we conclude the plaintiffs are not entitled to recover on their petitions, and the defendant is not entitled to recover on its counterclaim.
The petitions and the counterclaim will be dismissed.
It is so ordered.
Durfee, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. These actions were consolidated for purposes of trial with the consent of the parties and pursuant to the Court’s order of October 19,1955.
2. Plaintiff Byrne Organization, Inc. (hereinafter referred to as “Byrne”), at all times pertinent to this action was a corporation organized under the laws of the State of Delaware and was a firm of architects, engineers, and builders.
3. Plaintiff Gardner Displays of New York, Inc. (hereinafter referred to as “Gardner”), at all times pertinent to this action was a corporation organized under the laws of the State of New York and was engaged in the business of displays and exhibits.
4. The claims of both plaintiffs are based upon letters of intent relating to architectural and engineering services and construction management, in the case of Byrne, and the overall concept and design of Federal Government exhibits, in the case of Gardner, with respect to a proposed international exposition popularly called “Freedom Fair.” This fair, under consideration by the National Capital Sesquicentennial Commission (hereinafter referred to as the “com *590 mission”), did not materialize, and was abandoned by tlie commission on June 1,1950.
5. Plaintiff Byrne’s claim is for the sum of $229,336.76 comprised of a claim for a fee of $190,000 and for expenditures of $39,336.76 not reimbursed by the commission. This claim is based alternatively upon the terms of an unexecuted contract which Byrne claims was approved by the executive committee of the commission, or upon the reasonable value of services furnished pursuant to a letter of intent dated October 20,1949.
6. Plaintiff Gardner’s claim is for the sum of $90,500, consisting of a fee of $50,000 for the overall concept of Freedom Fair, $35,000 for the completion of approximately 70 percent of the design of the Federal Government exhibits, and $5,500 for legal and accounting expenditures in the preparation of its claim and attempted collection of amounts claimed to ibe due for work performed. Gardner bases its claim alternatively upon the terms of an unexecuted contract which it claims was approved by officials of the commission, or upon the reasonable value of services rendered under a letter of intent dated October 20,1949.
CHRONOLOGY OE EVENTS
7. In the latter part of 1946 a meeting of citizens of Washington, D.C., was held in the United States Chamber of Commerce building, pursuant to call of the Washington Building Congress, at which meeting it was voted to create a committee to sponsor legislation for an appropriate commemoration, in 1950, of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia. As a result of that meeting, a Citizens’ Sesquicentennia! Committee was organized with a membership totaling 15 persons. This committee met on December 27, 1946, and decided to draft a bill for congressional action in connection with the plan of commemoration.
8. The proposed bill, with minor changes, was endorsed by the Board of Commissioners of the District of Columbia on January 21, 1947. It was thereafter introduced in the Congress and the National Capital Sesquicentennial Commission was created by enactment of Public Law 203, 80th *591 Cong., 1st Sess., approved July 18,1947, which provided as follows:
Resolved Toy the Senate and Mouse of Representatives of the United States of America in Congress assembled, That, to provide for the appropriate commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia in the year 1800, there is hereby established a commission to be known as the National Capital Sesqui-Centennial Commission (hereinafter referred to as the “Commission”) and to be composed of fifteen Commissioners, as follows: The President of the United States, who shall be ex officio Chairman; the President pro tempore of the Senate and the Speaker of the House of Representatives, ex officio; three Senators to be appointed by the President pro tempore of the Senate and three Representatives to be appointed by the Speaker of the House of Representatives; three residents of the District of Columbia to be appointed by the President after receiving the recommendations of the Board of Commissioners of the District of Columbia; and three prominent citizens residents in the District of Columbia at large to be appointed by the President. The Commissioners, with the approval of the Chairman, shall select an Executive Vice Chairman from among their number.
Seo. 2. It shall be the duty of the Commission, after promulgating to the American people an address relative to the reason of its creation and of its purpose, to prepare a plan or plans and a program for the signalizing the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia; to give due and proper consideration to any plan which may be submitted to it; to take such steps as may be necessary in the coordination and correlation of plans prepared by State commissions or by bodies created under appointment by the governors of the respective States and Territories or by representative civic bodies; and, if the participation of other nations in the commemoration be deemed advisable, to communicate with the governments of such nations.
Sec. 8. When the Commission shall have approved of any plan of commemoration, then it shall submit such plan, insofar as it may relate to the fine arts, to the Commission of Fine Arts for its approval, and, insofar as it may relate to the plan of the National Capital and its *592 history, to the National Capital Park and Planning Commission and the Board of Commissioners of the District of Columbia for their joint approval, and in accordance with statutory requirements.
Seo. 4. The Commission, after selecting an Executive Vice Chairman from among its members, may employ a director and a secretary and such other assistants as may be needed to organize and perform the necessary technical and clerical work connected with the Commission’s duties and may also engage the services of expert advisers without regard to civil-service laws and the Classification Act of 1923, as amended, and may fix their compensation within the amounts appropriated for such purposes.
Sec. 5. The Commissioners shall receive no compensation for their services, but shall be paid actual and necessary traveling, hotel, and other expenses incurred in the discharge of their duties, out of the amounts appropriated therefor.
Sec. 6. The Commission shall, on or before the 2d day of January 1948, make a report to the Congress, in order that further enabling legislation may be enacted.
Sec. 7. The Commission shall expire December 31, 1952.
9. The following persons were appointed as commission members in accordance with the above Public Law:
Harry S. Truman, President of the United States
Arthur Vandenburg, President Pro Tempore of the Senate
Joseph Martin, Speaker of the House of Representatives
Senator C. Douglass Buck
Senator Arthur Capper
Senator Spessard L. Holland
Representative Everett M. Dirksen
Representative Walt Horan
Representative Sol Bloom
Mr, Robert V. Fleming
Mr. Joseph C. McGarraghy
Mr. John Russell Young
Mr. Carter T. Barron
Mr. Robert Woods Bliss
Mrs. Philip L. Graham
10. On March 8,1948, the first meeting of the commission was held, at the White House. Carter T. Barron was elected executive vice chairman of the commission, and be *593 came, for all intents and purposes, the chief administrative officer of the commission.
An executive committee pro tempore of the commission had held prior meetings because of the difficulty of many of the commission members in attending, due to their duties as Members of Congress. The chairman of this temporary executive committee, Mr. Joseph C. McGarraghy, recommended that an executive committee be appointed. All members of the commission agreed that such action was proper, and an executive committee, consisting of five members of the commission, was appointed with authority to act for the full commission. These members of the executive committee were as follows:
Senator C. Douglass Buck
Representative Sol Bloom
Mr. Robert V. Fleming
Mr. Joseph C. McGarraghy
Mr. John Russell Young
11. On June 25, 1948, an appropriation of $15,000 was made available by Congress for the use of the commission in its plans for the celebration through enactment of Public Law 785, 80th Cong., 2d Sess., which reads as follows:
National Capital Sesquicentennial Commission: For expenses necessary for the National Capital Sesquicentennial Commission to prepare and carry out a program for the commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, as authorized by the Act of July 18,1947 (Public Law 203), including personal services in the District of Columbia ; travel expenses of employees; travel, hotel, and other necessary expenses of the Commissioners; printing and binding; services as authorized by section 15 of the Act of August 2, 1946 (5 U.S.C. 55a), at rates for individuals not in excess of $35 per diem; deposits hi the Treasury for penalty mail; and rent in the District of Columbia; $15,000, to remain available during the life of the Commission: Provided, That the Commission may accept, and utilize gifts of money or services from private individuals and organizations.
12. During the last week of June 1948, Edward Boykin was employed as director of the commission, pursuant to *594 section 4 of tlie Public Law of July 18, 1947. Mr. Boykin drew up plans for the sesquicentennial celebration using freedom as the theme. His original plans are known as Plan A. These plans were taken up individually, item-by-item, by the executive committee and most of them were approved. Those approved were executed in connection with the sesquicentennial celebration and are not directly involved in this action. These approved plans provided for the following items:
1. Historical art exhibit in the Corcoran Gallery of Art.
2. Exhibit of the Plan of Washington, under the auspices of the Commission of Fine Arts and the National Capital Park and Planning Commission.
8. American historical portrait exhibit at the National Gallery of Art.
4. Various ceremonies, parades, pageants, and other functions and entertainments, separate and apart from Freedom Fair.
5. Historical mural around Washington Monument.
6. Construction and equipment of an outdoor amphi-theatre to be erected in Rock Creek Park.
7. Production of a symphonic drama composed by Paul Green.
8. Documentary motion picture to be based on the history of the City of Washington.
9. Historical booklets and literature including therein composition, printing, binding, and production.
13. In August 1948, George M. Rowland, vice president of Gardner, read a news release concerning the proposed sesquicentennial celebration in a New York newspaper and came to Washington, D.C., to see Mr. Boykin in an attempt to solicit business in connection with the project. He volunteered his services to Mr. Boykin with regard to plans for the celebration. He was aware that no funds were available at that time to compensate him for any service he might render, and he was cautioned that he was operating on his own, voluntarily, in soliciting business. Mr. Boykin told him, however, that, if any of his proposed plans were acceptable to the commission, he (Boykin) would recommend that Gardner receive a contract; but Mr. Boykin advised Mr. Rowland that he (Boykin) had no authority to give Gardner any business. Mr. Rowland suggested at that time that a world’s *595 fair be held in connection with, the sesquicentennial, and Mr. Boykin liked the idea.
14. Mr. Boykin prepared a budget for the sesquicentennial celebration in the amount of $2,798,000, which was approved by the executive committee on November 3,1948, and by the full commission, by resolution, on December 14,1948. This budget apparently contemplated the erection of buildings on the Washington Monument grounds for a sesquicentennial exposition. Plans for such an exposition were presented to the commission by architect Leon Chatelain at the December 14,1948, meeting. These plans were approved by resolution and accepted in principle, subject to consideration of further details involved.
15. On February 8, 1949, the commission gave additional approval for Chatelain to draft plans and specifications for the buildings to be erected on the Monument grounds for this exposition. The estimated cost of this construction was $1,200,000. Mr. Boykin was instructed to immediately obtain approval of these plans from the Commission of Fine Arts, the National Capital Park and Planning Commission, and other interested agencies, as provided in Public Law 203. Mr. Boykin was also instructed at this meeting to keep the commission more closely informed on the activities of his office and to send copies of important letters to each commissioner.
16. The Commission of Fine Arts disapproved the erection of the proposed buildings on the Monument grounds and it was suggested that the polo grounds in West Potomac Park be used for the exposition. Mr. Chatelain informed the director of the commission that his buildings could not be adapted to the West Potomac Park site, and the executive committee thereafter rescinded the approvals previously given to Chatelain’s proposal.
17. During this period President Truman had recommended that $1,500,000 be appropriated for the commission. Carter Barron was then attempting to have this appropriation raised to $3,000,000. On April 6, 1949, the House of [Representatives eliminated entirely the recommended appropriation of $1,500,000 from the second deficiency appropriation bill to which it had been attached.
*596 18. Gerald M. Muscott, director of designs for Gardner, conceived the idea of having buildings built in the shape of the letters “17”, “S”, and “A” for the fair, on the West Potomac Park site. Mr. Rowland presented sketches of this plan to Carter Barron, who became very enthusiastic about the idea. Work performed in connection with this proposed plan is involved in this suit.
19. On April 15,1949, the occasion of the nest meeting of the commission, which was held at the White House, President Truman opened the meeting with the following statement:
In March, 1948, at the first meeting of the National Capital Sesquicentennial Commission, which was created by Congress to plan the celebration of the 150th birthday anniversary of our Nation’s Capital, I said: “It is a matter of importance to all citizens of the United States and a symbol to freedom-loving people everywhere.” That statement has even more pertinent application now than a year ago.
The Commission, under the authority granted to it by the Congress, has created a sound program for the observance of the important event in our American history — one which I believe will bring home to every American, and to the world, the full significance of our great heritage of freedom.
I believe the exposition planned by the Commission offers a timely opportunity for all elements of our national life to demonstrate the achievements of our free enterprise system, on a site in the heart of the Capital. I hope that all our States and Territories, industry, labor and all Government agencies and departments will respond wholeheartedly to our invitation to participate. _
_ I can think of no more appropriate name for this important celebration than the Freedom Fair — and I urge all Americans to help in making it a symbol of America’s faith in the democratic principles upon which our Nation was founded.
The minutes of the meeting of April 15,1949, continued, in part:
A motion was then offered by Senator McKellar, and seconded by Congressman Horan to endorse the President’s remarks. The motion was carried. The President then turned the meeting over to the Executive Vice Chairman and most courteously took leave.
*597 20. A drawing of tlie new plans for Freedom Fair, utilizing buildings designed in the shape of the letters “U”, “S”, and “A” as key structures, was presented to the commission by Mr. Boykin on April 15,1949, and there was considerable discussion of these plans and of the possible revenue to be obtained from industry through lease of space in such buildings. It was just prior to this meeting in the White House that Director Boykin learned of the new plan from Carter Barron, as all contacts by Gardner regarding the matter had been with Carter Barron. The building plan was also explained to the commission by Mr. Bowland on June 28,1949.
21. Shortly after the meeting of April 15,1949, the Public Buildings Administration and the Navy Department objected to the removal of the temporary buildings on the West Potomac Park site, and Carter Barron, with the concurrence of his aides and staff, decided to attempt to obtain for Freedom Fair the Anacostia Park site, which is located at the east end of East Capitol Street near the site of the D.C. Armory.
22. The commission was authorized to proceed with plans for Freedom Fair by Public Law 78, 81st Cong., 1st Sess., approved May 31, 1949, which provided as follows:
Whereas the joint resolution entitled “Joint resolution to provide for the appropriate commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia,” approved July 18, 1947, established the National Capital Sesquicentennial Commission for the purpose of preparing plans and developing programs commemorating the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia in the year 1800; and
Whereas pursuant to said joint resolution the National Capital Sesquicentennial Commission has, after extending invitations to the several States, the Territories, the District of Columbia, the departments and agencies of the Federal Government, the governments of other nations, and various other civic bodies, organizations, and agencies to join in such celebration by the presentation of exhibits and participation in other programs, adopted a plan or plans which the Commission feels will appropriately and suitably manifest the significance of the sesquicentennial anniversary of the establishment of the *598 seat of the Federal Government in the District of Columbia; and
Whereas the Congress finds that such commemoration and celebration are worthy and deserving of the support and encouragement of the people of the United States and that the National Capital Sesquicentennial Commission should be authorized to proceed immediately with the execution of the plan or plans.for such commemorative exercises: Now, therefore be it
Resolved Toy the Senate and House of Representatives of the United States of America in Congress assembled, That the National Capital Sesquicentennial Commission (hereinafter referred to as the “Commission”) is hereby authorized to carry out the plans adopted by it in accordance with the joint resolution entitled “Joint resolution to provide for the appropriate commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia,” approved July 18, 1947, for celebrating the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, and to modify such plans whenever in the discretion of the Commission such action is necessary and desirable.
Seo. 2. The Commission shall prescribe the duties of the Director appointed under the authority of said joint resolution and may delegate to him such powers and f mictions as it shall deem advisable in order to give effect to the provisions of this joint resolution. The Director shall exercise such powers as are delegated to him by the Commission ancf in order to facilitate the functioning of his office may subdelegate such powers as may be deemed advisable by the Commission to those in the employ of, or detailed to, the Commission.
Sec. 3. In carrying out the purposes of this joint resolution, the Commission is authorized—
(a) to appoint, without regard to the civil-service laws and regulations and the Glassification Act of 1923, as amended, such clerks, stenographers, skilled and technical assistants, and other personnel as may be needed in organizing and carrying out the plans of the Commission ; to purchase such materials, and to contract for such labor and other services as may be necessary in connection with the performance of the functions of the Commission, including the preparation and production of exhibits and plays;
(b) to erect a building or buildings, or other structures, for its own use, and to further the purposes of the *599 sesquicentennial celebration, and to provide for the landscaping of the site or sites thereof; to provide for the decoration and maintenance of such buildings, structures, sites, and grounds during the period deemed necessary by the Commisson; to rent such space in the District of Columbia without regard to section 322 of the Act of June 30, 1932 (47 Stat. 412), as amended, as the Commission may deem necessary: Provided, That the erection or construction of the buildings and landscaping of sites shall be under agreements mutually acceptable to the Commission and the Federal and District of Columbia agencies having jurisdiction and control over the area or areas involved, and shall be approved by the National Capital Park and Planning Commission: Provided further, That in the construction of buildings and exhibits requiring skilled and unskilled labor the prevailing rate of wages as provided in the Act of March 3, 1931 (46 Stat. 1494), as amended, shall be paid;
(c) to allot funds appropriated for the purposes of this joint resolution to any executive department, independent office, or establishment of the Federal Government, with the consent of the head thereof, or to the District of Columbia Government, with the consent of the Commissioners of the District of Columbia for direct expenditure in executing the duties or functions delegated to it by the Commission;
(d) to fix and collect charges for admission to exhibits, plays, and dramatic productions: Provided, That all revenues received by the Commission from such source shall be covered into the Treasury of the United States to the credit of the appropriation to be made pursuant to the authority contained herein and may be expended and shall be accounted for in the same manner as other funds authorized for expenditures by the Commission;
(e) to receive contributions of money, materials, and other property from any source to aid in carrying out the purposes of this joint resolution; to borrow materials or. exhibits; to accept the services of any skilled or unskilled labor that may be made available to it; and to accept reimbursement from private organizations or individuals for rights or privileges granted by it: Provided, That all contributions and reimbursements shall be expended and accounted for in the same manner as the funds made available under an appropriation made pursuant to the authorization contained in this joint resolution.
Seo. 4. (a) The heads of the executive departments, independent agencies, and establishments of the Federal *600 Government, and the Commissioners of tbe District of Columbia, are authorized to cooperate with the Commission in the procurement, installation, and display of exhibits, and to lend to the Commission such articles, specimens, and exhibits as the Commission shall deem to be in the interest of the United States and in keeping with the purposes of the sesquicentennial celebration; to appoint without regard to the civil-service laws and regulations and the Classification Act of 1923, as amended, such draftsmen and other skilled assistants as may be necessary; to contract for such labor and other services as shall be deemed necessary; and to designate officials or employees in their respective spheres to assist the Commission.
(b) The Commission is authorized to allot to the departments, offices, and establishments of the Federal Government to the several States, the District of Columbia, the Territories of the United States, and the Soveramente of other nations, that have signified their esire to create exhibits for the sesquicentennial celebration, space within any structure or structures erected pursuant to the authority conferred by this joint resolution. The Commission shall arrange for the selection, presentation, assembling, transportation, installation, safekeeping, exposition, demonstration, and return of such articles and materials as the Commission shall decide to include in the exhibit of such celebration.
(c) At the close of the sesquicentennial celebration, or when the connection of the Government of the United States therewith ceases, the Commission shall return such property as may have been borrowed. Any expense incident to tne restoration, modification, and revision of such property to a condition which will permit its use at subsequent expositions and fairs, and the expense incident to continuing the employment of personnel necessary to close out the fiscal and other records and to prepare the required reports of the participating organizations, may be paid from the funds made available pursuant to the authorization contained herein. If the return of any such property loaned by a department, agency, or establishment of the United States, or by the District of Columbia, is not feasible, the Commission may, with the consent of the lender, make such disposition thereof as may be deemed advisable and in the public interest. The Commission shall dispose of all remaining property and materials, including buildings and structures, at public sale to the highest bidder and the proceeds thereof shall be covered *601 into the Treasury of the United States as miscellaneous receipts: Provided, That the Commission may upon request, if it deems it to be in the public interest, transfer without consideration the title to any permanent building or structure constructed hereunder to any agency of the United States having control and jurisdiction over the land on which such building or structure is located, subject to the approval of the National Capital Park and Planning Commission. The Commission shall account for all property, materials, buildings, or structures disposed of pursuant to this subsection.
Sec. 5. Such sums as are necessary to carry out the purposes of this joint resolution are hereby authorized to be appropriated, and shall remain available until expended ; except that upon the termination of the Commission any unexpended or unobligated balances shall be covered back into the Treasury of the United States. The appropriation authorized by this joint resolution shall be available for the operation of the building or buddings, structure or structures, improvement or improvements, including light, heat, water, gas, janitor, and other required services; for the rental of space in the District of Columbia; for the selection, purchase, preparation, assembling, transportation, installation, arrangement, repair, safekeeping, exhibition, demonstration, and return of such articles and materials as the Commission may decide shall be included in Government exhibits; for the purchase of uniforms; for the compensation of the Director, and other officers and employees of the Commission in the District of Columbia and elsewhere; for actual and necessary traveling, hotel, and other expenses incurred by the Commissioners, the Director, and other officers and employees of the Commission in the discharge of their duties under this joint resolution ; for telephone service; for the purchase or rental of furniture and equipment (including typewriting and other office machines), stationery and supplies, maps, reports, documents, plans, specifications, manuscripts, newspapers, and all other appropriate publications: Provided', That payment for telephone service, rents, subscriptions to newspapers and periodicals, and other similar purposes, may be made in advance; for the hire and operation of passenger-carrying automobiles in the District of Columbia; for printing and binding to be done, in the discretion of the Commission, by establishments other than the Government Printing Office; for entertaining of distinguished visitors; and for all other expenses as may be deemed necessary by the Commis *602 sion to fulfill properly the purposes of this joint resolution: Provided further, That all purchases, expenditures, and disbursements of any moneys made available by authority of this joint resolution shall be made under the direction of the Commission in accordance with law. All accounts and vouchers covering expenditures shall be approved by the Director or by such assistants as the Commission may designate, except for such allotments as may be made to the various executive departments, independent offices, and establishments, or the District of Columbia Government for direct expenditure ; but these provisions shall not be construed to waive the submission of accounts and vouchers to the General Accounting Office for audit.
Sec. 6. Upon request of the Commission, the Director of the Bureau of the Mint is authorized to cause to be issued an appropriate medal commemorating the celebration of the sesquicentennial hereby authorized, which medal shall be sold to the public by the Commission at such price as may be determined by it: Provided, That all revenues received by the Commission from such source shall be covered into the Treasury of the United States to the credit of the appropriation to be made pursuant to the authority contained herein and may be expended and shall be accounted for in the same manner as other funds authorized for expenditures by the Commission. The Director of the Bureau of the Mint is further authorized to cause to be issued badge medals in such quantity as the Commission shall determine, to be awarded to individuals or organizations in recognition of their participation in the celebrations hereby authorized, or for other outstanding service. The Commission shall reimburse the Bureau of the Mint for the cost of the medals and emblems.
Seo. 1. All articles which shall be imported from foreign countries for the purpose of exhibition at the sesquicentennial celebration, or for use in constructing, installing, or maintaining foreign exhibits during such celebration, upon which there shall be a tariff or customs duty, shall enjoy, to the same extent and in the same manner the privileges conferred by Public Law 614, Eightieth Congress, approved June 8, 1948. The provisions of the last proviso of said Public Law 614, and the procedures prescribed therein, shall be applicable to merchandise imported for use in the sesquicentennial celebration, and the National Capital Sesquicentennial Commission shall be regarded as standing in the place and stead of the International Industrial Exposition, *603 Incorporated, designated therein, with respect to any merchandise imported for the purpose of carrying out the provisions of this joint resolution.
Sec. 8. It shall be the duty of the Commission to transmit to the Congress, within six months after the close of the sesquicentennial, a detailed statement of all expenditures and such other reports as may be deemed proper or called for. Upon the transmission of such report to the Congress the Commission established by and all appointments made under the authority of this joint resolution shall terminate.
Approved May 31,1949.
23. Carter Barron required expert advice with regard to accurate estimates and construction costs of Freedom Fair. Minor Hudson, attorney for Gardner, who had previously been attorney for Byrne, suggested to Carter Barron that Byrne be contacted for this purpose. John E. Byrne, Sr., president of the firm, was contacted about June 17,1949, and he agreed to volunteer the services of Byrne with the hope of eventually receiving a contract for architectural, engineering, and construction management services for Freedom Fair, when and if an adequate appropriation was obtained and the proposed fair became a reality.
24. On June 27, 1949, Byrne presented Mr. Barron with a budget of estimated costs and income expected from Freedom Fair. Total cost of this project was estimated at $17,888,750, with advance requirements of $15,112,500. Revenue, which was expected to be obtained from admissions, concessions, and sale of exhibit space in various buildings to private industry, was estimated at $20,875,000, with a possible profit of $2,986,250.
25. A meeting of the commission was thereafter held on June 28,1949, at the White House. Commissioners present at this meeting were President Truman, Senator McGrath, Representative Norton, and Messrs. Young, Fleming, Barron, and McGarraghy. Also in attendance, to report on sesquicentennial activities, were Messrs. Fowler, Rowland, and Boykin.
Messrs. Rowland, Fowler, and Barron presented the commission with the plans, scope, and cost of Freedom Fair as proposed on the Anacostia Park site, and furnished the com *604 mission with the budget figures prepared by Byrne. The President withdrew from the meeting during the presentation of plans for the celebration and the remaining six commissioners discussed the proposed plans.
26. Senator McGrath and Messrs. Fleming and McGar-raghy were clearly of the opinion that this was an ambitious and extensive program and that Freedom Fair should not be undertaken until firm commitments were obtained from industry to purchase sufficient exhibit space to make this project feasible. Mr. Barron, although enthusiastic about Freedom Fair, also was of the opinion that it should be undertaken only with the assurance that it would be self-liquidating and could provide the public with several million dollars in assets. He thought the plan looked good on paper but he felt that it was necessary to have firm commitments from businessmen before the proj ect was undertaken. He and Mr. Rowland felt that approximately 60 days would be required to determine whether private industry would support Freedom Fair sufficiently to make it feasible. Commissioner Young made no comment with respect to Freedom Fair at this meeting.
27. Representative Norton advised members of the commission at the meeting on June 28, 1949, that she had discussed with chairman Clarence Cannon of the Appropriations Committee the matter of putting through a resolution in the House authorizing the Reconstruction Finance Corporation to advance funds to the commission to get the project underway. It was Mrs. Norton’s opinion that chairman Cannon would not approve any more than the $2,000,000 which had been previously under consideration. A motion to attempt to have such a resolution approved was affirmed unanimously by the commission. Representative Norton volunteered to introduce this in the House of Representatives.
28. Mr. Rowland, who had previously given news releases regarding the progress of Freedom Fair, made the following statement toward the end of this meeting:
We have had so many reversals we should not release publicity today other than that we met and the President’s statement.
*605 29. Carter Barron was very enthusiastic about plans for Freedom Fair from the initial conception of the idea; however, there were some members of the commission, and other outside interests, who opposed Freedom Fair from the start. The record indicates that Mr. Barron was so anxious to make Freedom Fair a reality that he preferred to make such progress as he could without taking up all matters with the commission. Director Boykin’s authority was bypassed on various matters relating to Freedom Fair, after about June 28, 1949, and Byrne and Gardner took their problems directly to Mr. Barron, who made the decisions relating to Freedom Fair or instructed Mr. Boykin concerning what was to be done. Mr. Barron instructed Mr. Boykin to tell the executive committee as little as possible regarding his dealings and transactions with Byrne and Gardner, and Mr. Boykin followed these instructions.
30. Minor Hudson was registered as a lobbyist for both plaintiffs, who were interested in passage by the Congress of an appropriation for the sesquicentennial celebration. He also gave legal advice to Carter Barron regarding Freedom Fair from time to time from the date of the inception of the idea for Freedom Fair, in the spring of 1949, until about January 1950.
31. By memorandum dated July 7, 1949, Minor Hudson advised Mr. Barron that the only possible solution to the problems confronting Freedom Fair would be to form a private, nonprofit corporation, Freedom Fair, Inc., to plan, build, operate, and enter into the various contracts necessary to put on Freedom Fair. In this connection, the commission had no authority to borrow money, and no authority to establish its own bank account, and any money that might be received from sales of exhibit space to industry would go directly into the United States Treasury without the commission being able to use such funds.
On July 15,1949, consideration was given to a plan whereby Minor Hudson, on behalf of the commission, would attempt to have the proposed legislation for the commission’s appropriation amended to include authority to form a nonprofit corporation. It was decided, however, that, should the proposed amendment jeopardize the passage of the bill, no *606 such procedure would be followed. It was also decided that Mr. Barron should obtain a legal opinion from the Attorney General as to whether the commission had the authority to enter into a management contract with a private corporation such as Freedom Fair, Inc.
32. Attorney James B. C. Howe was loaned to the commission from the White House staff about April 1, 1949, specifically to negotiate the transfer of several buildings which were located on the West Potomac Park site from the Federal Works Agency to the sesquicentennial commission for exhibit space and also to perform for Carter Barron such legal services as might be required.
During July and August of 1949 Mr. Barron requested legal advice from Mr. Howe regarding the formation by the commission of the new corporation Freedom Fair, Inc., which had been proposed. Both Barron and Boykin advised Mr. Howe concerning the type of contracts which it was planned to negotiate with Minor Hudson for Byrne and Gardner.
33. Mr. Howe advised both Barron and Hudson that the formation of the proposed corporation was contrary to the Government Corporations Act unless specifically authorized by Congress. He told them that the legislation passed on May 31, 1949, did not include authority to have a separate corporation, and pointed out that if such a corporation was necessary an attempt should be made to amend the legislation to include tins authority.
34. Proposed contracts for Byrne and Gardner, as drafted by Minor Hudson, met with strenuous objection from Mr. Howe. He objected to consideration of such contracts at that time when the commission’s appropriation was only $15,000, most of which had already been disbursed, and he also objected to the provision in the proposed contracts which would compensate plaintiffs for work done on a voluntary basis prior to the date of any contract that might be executed. The original draft of the proposed contract with Byrne also called for the construction of Freedom Fair, but this was later deleted upon objection by Mr. Howe. Additionally, Mr. Howe felt that Government regulations required that both contracts be let through competitive bidding only.
*607 Minor Hudson, with, whom Mr. Howe had been negotiating, advised Howe that he was also representing Carter Barron in these contracts, and that Mr. Barron desired that these disputed provisions remain in the contracts. Mr. Howe thereafter submitted a memorandum dated August 23, 1949, addressed to Edward Boykin, regarding his objections to the proposed Byrne contract, and he orally advised Carter Barron that he had no statutory authority to execute such a contract. Mr. Barron advised Howe that he was being negative, and did not consult Howe further on any legal matter until the following year, after the appointment of the commission’s general counsel.
35. On July 19,1949, a letter of intent prepared by Minor Hudson for execution by Carter Barron was submitted to a group of private persons, including Harry Flaxman, Raymond Topper, Paul Alexander, and Harold Schendell, who were interested in the creation of the Freedom Fair and had formed an organization known as the “Leasing Bureau” in July 1949. The letter, which was addressed to Harold Schendell, was as follows:
This letter is to supplement my letter to you of even date which was written you to indicate to prospective space buyers your authority to contact them and to determine their interest in purchasing exhibit space in the Freedom Fair until such time as a formal contract has been entered into with you in line with the conditions enumerated hereinafter. It is, of course, understood by you and your associates, Messrs. Harry Flax-man, Raymond Topper and Paul Alexander, that no space sales contracts are to be consummated by you until a formal agreement has been entered into between your group and representatives of the National Capital Sesquicentennial Commission.
It is the plan of the Sesquicentennial Commission to incorporate a managing corporation to handle all business activities connected with the Sesquicentennial and the Freedom Fair. The contract granting to.your group exclusive franchise to handle space sales will be negotiated and signed with this managing corporation.
As we have pointed out to you in conferences, certain conditions must be attached to this space sales franchise to be awarded toyour group, namely:
1. The Commission or the managing corporation cannot incur any expense, including commissions, in connec *608 tion with, the sales unless and until a minimum of $7,500.,-000 worth of space sales have been completed. This amount will cover the minimum construction and other costs necessary to build the required exhibit buildings and to assure that the Freedom Fair can be operated as planned. When you have sold $7,500,000 worth of exhibit space, you will then be entitled to be paid a commission of 5% on the money received to that date under such sales.
2. In granting you an exclusive sales franchise without a time limitation, the Commission must protect itself by clauses to the effect that the franchise can be can-celled unless the sales are prosecuted vigorously by your group and unless minimum sales are completed as follows: (a) Sales totalling $4,000,000 within ninety days from date of signing of the contract with your group, and (b) minimum sales of $1,000,000 per month thereafter.
8. Your franchise covers the sale of exhibit space only to American business and labor unions in the IT, S, and A Buildings. In consideration for your services, and subject to limitations herein, it is agreed that you will be compensated at the rate of 5% commission on the gross sales. The amount to be charged for the space to be sold by you shall be at the rate designated by the Commission.
It is our understanding that you and your associates intend to form a corporation and, in such case, you shall have the right to turn over this agreement to such corporation.
It is agreed between us that for the 5% commission to be paid by the Commission or the managing corporation, you will do all things necessary to obtain the sales contracts, at your own expense, except the cost or expense of advertising. The Commission or its managing corporation expects, to conduct an advertising ana public relations campaign coincident with your sales campaign, but will be restricted by the amount of money available for such purposes, it being understood that neither.the Commission nor the managing corporation will be obligated to conduct such a campaign.. We, of course, shall lend whatever assistance we can in aiding your sales promotion. The form of exhibitors’ contracts shall be first approved by this Commission before used by you.
Of necessity,, we agree that you shall have the right to allocate all available space to such exhibitors as you shall obtain,, subject to approval of representatives of the Commission and. the managing corporation. No contracts for exhibit space shall be final until approved *609 by the Commission and the Commission shall have full authority to establish general standards and regulations governing allocation of space and general standards for all exhibits.
Checks for space purchases shall be made payable to the Commission or the managing corporation as will be determined later.
This group had negotiated with Carter Barron to make a survey of the interest of industry in the proposed fair, but was restrained from entering into any final contracts until the plan was approved by the commission. Although many inquiries were made of industry by the leasing bureau, no firm commitments were obtained, and the information obtained by the survey, which apparently was never completed, was not offered in evidence.
36. Another problem confronting the commission and Mr. Barron in 1949 was the necessity of obtaining an appropriation from Congress in order to proceed with the sesquicen-teimial celebration. On August 3,1949, Messrs. Barron and Boykin testified before the House Committee on Appropriations regarding H.B. 6008, 81st Cong., 1st Sess., in an attempt to obtain a $3,000,000 appropriation for the commission. On September 13,1949, they again testified, similarly, before the Senate Subcommittee of the Committee on Appropriations.
Both testified that the commission had authorized Plan A if an appropriation was forthcoming, and authorized a survey of industry to determine whether sufficient revenue could be obtained to erect Freedom Fair. They emphasized that the requested $3,000,000 appropriation would not be used except for $600,000 for Plan A, and that the remainder would be a “capital prestige loan” on deposit with the Treasury to be used if necessary after sufficient money was received from other revenue-producing sources of the proposed fair. Barron testified that no obligations had been incurred as to plans and specifications and that the commission had been proceeding on -a voluntary basis. Pertinent extracts from the hearings of the House Committee on Appropriations are as follows:
Mr. Barron [p. 205]. * * * Gentlemen, we have had no money to work with, so I could not obligate the Com *610 mission to any one to the extent of asking them to make plans and specifications; therefore, the total number of square feet embraced in this whole program has been estimated on a cost basis by the architects and the engineers. This is just a grant so that we can get going. The Commission will not spend a dime of your appropriation other than for the corollary activities, which I want Mr. Boykin to explain.
$ $ * $ $
We are not just going to take your money and start breaking ground, because that is only a drop in the bucket for this over-all project.
Mr. Barron [p. 209]. * * * No part of the $3,000,000 will be touched except for plan A, until the Commission has received enough revenue in sales and from other revenue-producing avenues of this proposed fair to secure the success of it. The $2,400,000 is merely a capital prestige loan which would be on deposit with the Treasury for the Commission to use after, and if necessary, we have received sufficient revenue.
Mr. Barron [p. 212] : The first and only money that will be touched out of the $3,000,000 will be the $600,000 for plan A until the Commission has sold space in the Freedom Fair. The rest will not be touched. It is just a prestige loan that the Commission will have until the program is assured of success. * * *
Mr. Boykin [p. 218]. May I make this very clear, Mr. Taber: that at the last meeting of this Commission, the Commission authorized two things: (1) that this corollary plan A be put into operation at once, if we got any money. These are the figures that will carry the plan A through, and the figures that you see here are the possible returns for the plan A.
The Commission also authorized the Director and the Executive Vice Chairman to proceed to find out whether or not the Freedom Fair was a feasibility, in other words, to go ahead with this plan A and to ascertain also whether or not we could sell the $9,000,000. worth of space. That is what was authorized and that is what Mr. Barron is talking about.
Mr. Babaut [Committee member]. Are you convinced it can be ?
Mr. Barron. Yes, sir.
Pertinent extracts from the hearings of the Senate Subcommittee of the Committee on Appropriations on September 13,1949, are as follows:
*611 Mr. Boykin [p. 145]. Mr. Chairman, and Senator Gordon, may I make something very clear at the start of my testimony; that at a meeting of the Commission at the White House on June 28, the Commission authorized two things; one was that the Director in the event the Congress was pleased to make an appropriation for the Commission, should proceed with what is known as plan A, and to carry out that plan for a celebration in 1950. The second thing which is authorized was that the Director and the executive Vice Chairman endeavor to determine whether or not a Freedom Fair, as has been projected, was a feasibility. In other words, to go ahead with plan A as a celebration and to find out definitely whether or not we could sell American industry $8,000,000 worth of exhibit space that would make a Freedom Fair a possibility and a feasibility.
Mr. Boykin ¡[p. 149]. * * * In other words the Freedom Fair can come about only after we have put plan A into operation, and if we have proved that we can sell enough space to justify it. In other words, sir, plan A is a plan that costs between $600,000 and $700,-000 to carry through, and the Freedom Fair is something else beyond that. If we can prove while we are carrying on plan A that we can sell $8,000,000 worth of space to industry, then we can go ahead with the Freedom Fair, and we can’t otherwise.
Mr. Barron [p. 157]. * * * [W]e have proceeded on q tmlrmfooi* Ivacic ^ ^ ^
Mr. Barron |[p. 158]. * * * We need $685,000 for plan A, and if we are going to proceed on plan B, which includes the Freedom Fair, we should have the maximum request of $3,000,000; but we want you to bear in mind, gentlemen, that while your Commission is a Government-created organization, it will not spend any portion of that money until and unless it is needed.
If our leasing bureau is successful in delivering these funds, we may never have to call upon more than an additional $100,000, shall I say, of that $8,000,000. * * *
37. On September 20, 1949, the Senate issued Report No. 1092, 81st Cong., 1st Sess., regarding the $3,000,000 appropriation proposed for the commission. Pertinent portions of this report are as follows:
It was testified at the Senate hearing that approximately $682,850 is required to put into operation so-called plan A, and that approximately $2,317,150 was being requested as a capital cushion for the Freedom *612 Fair. It was also testified that this capital cushion would not be used by the Commission unless and until it was reasonably sure that it could create and go forward with the Freedom Fair. It was further pointed out that if the Commission’s leasing bureau is successful in raising funds, it may be necessary to use only about $100,000 of the $2,317,150 capital cushion.
In approving an appropriation of $3,000,000 for the National Capital Sesquicentennial Commission, the committee does so with the hope that this undertaking will be self-liquidating, and that these funds will be returned to the Treasury of the United States.
38. Although the appropriation bill, as originally proposed, authorized the commission to pay obligations of the commission incurred between July 1, 1949, and the date of the appropriation, this portion was stricken from the appropriation bill prior to its enactment by the Congress.
39. On October 14,1949, Congress appropriated $3,000,000 for the commission, which appropriation was included in the Supplemental Appropriation Act, 1950, Public Law 358,81st Cong., 1st Sess., and read as follows:
For expenses necessary for the National Capital Sesquicentennial Commission to prepare and carry out a program for the commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, as authorized by the Acts of July 18, 1947 (Public Law 203) and May 31, 1949 (Public Law 78), including personal services and rent in the District of Columbia; services as authorized by section 15 of the Act of August 2, 1946 (5 U.S.C.' 55a); and such construction or other expenses as may now be authorized by law; $3,000,000.
40. Immediately after the appropriation was enacted, Minor Hudson prepared letters of intent addressed to his clients and delivered them to Mr. Barron for signature. They were ultimately signed by Carter Barron. The letter of intent to Byrne read as follows:
This is a Letter of Intent to inform you that the National Capital Sesquicentennial Commission will award you a cost plus a fixed fee service contract for all architectural, engineering, and incidental services for the complete layout, design, planning and construction management of the Freedom Fair, including prepara *613 tion of tbe necessary drawings, blue prints, scale models and specifications.
This Letter of Intent, upon your acceptance, shall be effective as of October 20, 1949, and you are authorized and directed as of said date to proceed with the work in order that completion may be expedited.
The definitive contract will be executed as expeditiously as possible. Such definitive contract, when executed, shall supersede this Letter of Intent, but all work done under this Letter of Intent shall be deemed to have been done under such definitive contract.
Payments under this Letter of Intent may be assigned pursuant to the Assignment of Claims Act of 1940, and will not be subject to reduction or set off for any indebtedness from you to the United States arising independently of this contract.
All contract provisions required by law to be incorporated in contracts of this kind are by this reference incorporated in the Letter of Intent.
If this Letter of Intent is satisfactory to you, please so indicate by signing in the space provided for acceptance on the original and one of the enclosed copies, and by returning such signed original and copy to this office immediately. Thereupon this Letter of Intent shall constitute an agreement between you and the National Capital Sesquicentennial Commission until the execution of the definitive contract.
Gardner’s letter of intent read as follows:
This is a Letter of Intent to inform you that the National Capital Sesquicentennial Commission will award you a fixed price contract for the design of the over-all conception of Freedom Fair, and for the design and preparation of specifications and shop drawings for each of the Federal Government _ exhibits to occupy twenty-five exhibit spaces to be exhibited in the Federal Building.
The design of the exhibits for the Federal Government Departments, offices and agencies shall be subject to approval of the National Capital Sesquicentennial Commission, and subject to the approval of the individual Federal Government Department, agency or office for which the exhibit is designed. The Federal Government exhibits shall be designed so that the construction cost of all such exhibits shall not exceed $1,625,000. The design, drawings and specifications shall be prepared to permit competitive bidding on the construction of each such exhibit.
*614 This Letter of Intent, upon your acceptance, shall be effective as of October 20, 1949, and you are authorized and directed as of said date to proceed with the work in order that completion may be expedited.
The definitive contract will be executed as expeditiously as possible. Such definitive contract, when executed, shall supersede this Letter of Intent, but all work done under this Letter of Intent shall be deemed to have been done under such definitive contract.
Payments under this Letter of Intent may be assigned pursuant to the Assignment of Claims Act of 1940, and will not be subject to reduction or set off for any indebtedness from you to the United States arising independently of this contract.
All contract provisions required by law to be incorporated in contracts of this kind are by this reference incorporated in the Letter of Intent.
If this Letter of Intent is satisfactory to you, please so indicate by signing in the space provided for acceptance on the original and one of the enclosed copies, and by returning such signed original and copy to this office immediately. Thereupon this Letter of Intent shall constitute an agreement between you and the National Capital Sesquicentennial Commission until the execution of the definitive contract.
41. There is a difference of opinion between the parties as to when the above letters of intent were signed and delivered to the plaintiffs. Substantial evidence offered during the trial would indicate that these letters were signed by Carter Barron on or about November 23, 1949, and accepted by plaintiffs effective October 20,1949.
42. On or about November 1, 1949, Carter Barron sent unsigned drafts of the letters of intent to Mr. Boykin to read and return. Boykin immediately took the matter up with attorney Howe, who advised Boykin the letters were out of order and that there was no authority to execute them. He instructed Boykin to have nothing to do with them. Boykin discussed these letters with Carter Barron a number of times, informing him that he (Barron) had no authority to execute them. These letters remained on Boykin’s desk about 3 or 4 weeks without signatures. Minor Hudson went to Boykin’s office on or about November 23, 1949. Boykin was not in his office at the time, but Hudson took the letters of intent from Boykin’s desk. Later, on that same date, *615 Hudson returned to Boykin’s office and told Ms secretary that Carter Barron bad requested that sbe type the letters of intent in final form for bis signature. Sbe complied with Mr. Hudson’s request, and the letters were signed by Carter Barron.
43. Carter Barron did not request or receive authority from the commission to issue letters of intent, nor did be notify the commission or the executive committee of Ms intention to give letters of intent to plaintiffs.
44. On October 19, 1949, Minor Hudson prepared a letter for Carter Barron to the Attorney General requesting a decision as to whether the commission had authority to form the nonprofit corporation Freedom Fair, Inc. On November 23,1949, the Department of Justice furmshed Minor Hudson with a copy of the letter which it planned to send to Carter Barron regarding this matter; however, the original was not sent because Hudson indicated he might desire to withdraw the inquiry rather than receive the letter. Thereafter Hudson told the Department of Justice a formal reply to Carter Barron’s letter would not be necessary. Pertinent portions of tMs unmailed letter are as follows:
Pursuant to the arrangement made by the Attorney General and described in his letter to you of November 2,1949, this Division has had under study the proposed establishment of Freedom, Fair, Inc., as outlined in your letter of October 19,1949, to the Attorney General.
You raise the question in your letter of October 19 as to whether the establishment of tMs corporation and the vesting in. it of the functions you describe would constitute an illegal delegation of authority by the National Capital Sesquicentennial Commission. My views as to this axe expressed briefly below. Preliminarily, however, it must be pointed out that the provisions of the Government Corporation Control Act of December 6, 1945 (59 Stat. 597) may prohibit the creation of such a corporation by you as an officer, or by the Commission as an agency, of the Federal Government. Section 304 (a) of the Act (31 IJ.S.C. 869(a)) provides:
“No corporation shall be created, organized or acquired hereafter hy any officer or agency of the Federal Government or by any Government corporation for the purpose of acting as an agency or instrumentality of the UMted States, except by Act of Congress or pursuant to an Act of Congress specifically authorizing such action.”
*616 It is, or [sic] course, apparent that Congress has not specifically authorized the establishment of a corporation by the Commission either in its Joint Resolution establishing that body or in its subsequent Resolution authorizing the Commission to proceed. It seems almost equally as clear that Freedom Fair, Ino., in the performance of the functions you outline, would operate as an agency or instrumentality of the United States. In the light of the statutory language above quoted, I must therefore, regretfully express doubt as to the legality of the Commission’s proposed action in the respect under discussion.
The Department of Justice suggested that its interpretation of the statute be checked additionally with the General Accounting Office (G.A.O.).
45. The results of the inquiry which was submitted to the Attorney General were not made known to the commission or the executive committee. Minor Hudson advised Messrs. Barron, Rowland, and Maybruck regarding this decision by the Attorney General and Mr. Maybruck reported to the operational committee on November 29, 1949, that the proposed reply of the Department of Justice on the formation of Freedom Fair, Inc., was negative. The operational committee was an advisory group formed by Carter Barron, plaintiffs, some staff members, and other persons who had a business interest in Freedom Fair. This organization was not known to the commission nor was it an officially-constituted group of the commission or the executive committee.
46. On November 3, 1949, Carter Barron directed a letter to the Comptroller General, upon advice of Minor Hudson, requesting an opinion as to whether the commission could negotiate a cost-plus-a-fixed-fee contract with Byrne for architectural, engineering, and management services, and a lump-sum contract with Gardner for the overall concept of Freedom Fair and design of Federal exhibits. On November 22, 1949, the Comptroller General replied, in pertinent part, as follows:
* * * [T]he Supplemental Appropriation Act, 1950, Public Law 358, approved October 14, 1949, making funds available to the Commission, provides expressly for only one exception from said section 3709, Revised Statutes — that contained in section 15 of the act of *617 August 2, 1946, 60 Stat. 810, 5 U.S.C. 55(a), under which, the head of any department when authorized in an appropriation or other act, may procure the temporary (not to exceed one year) services of experts or consultants or organizations thereof by contract without regard to section 3709, Revised Statutes.
The Comptroller General stated that plaintiffs’ proposed contracts “reasonably may be considered as requiring the type of expert and consultant services covered by the authority contained in section 15 of said act of August 2, 1946.” Consequently, it was his opinion that, as to those contracts, advertising would not be necessary provided the services would not extend beyond one year. Pie advised, however, that this opinion related to a basis for contracting only and should not be regarded as approval of such contracts, and stated that appropriate safeguards should be provided in these contracts to protect the interests of the Government.
47. During the period shortly after the appropriation was received by the commission, Boykin and Barron, with plaintiffs’ participation, were attempting to get approval of the site and buildings from the Commission on Fine Arts, the National Capital Park amd Planning Commission, the District of Columbia Commissioners, and other Federal and District of Columbia agencies having jurisdiction and control over the area involved, in accordance with Public Laws 203 and 78.
On October 28,1949, the National Capital Park and Planning Commission approved the site, provided:
1. That further approval would be given to the proposed plans of the buildings.
2. That buildings would be temporary and would be removed not later than December 31, 1952, and that the commission would reserve sufficient funds for their removal or include removal in a suitable contractual agreement.
3. That the commission would allocate funds for the Recreation Department to relocate its recreation facilities ($100,000 was requested for this relocation).
48. The District of Columbia Commissioners did not formally approve the plans for Freedom Fair, since there was then pending a plan to build a bridge, commencing in *618 the first part of 1951, which would continue East Capitol Street over a section to be used by Freedom Fair. It was agreed that both parties would cooperate in trying to work out this joint problem. Evidence before this court does not reveal that any agreement was reached on this problem prior to abandonment of Freedom Fair.
49. The most difficult problem facing the commission with regard to the site was removal of the existing temporary buildings. The necessary approval for the removal of these buildings was requested from the Public Buildings Administration.! Approval was never obtained from this agency, and negotiations had reached an impasse by December 19, 1949, regarding this matter. The commission later abandoned attempts to remove the buildings and, prior to complete abandonment of Freedom Fair, the commission contemplated using a completely different overall plan for Freedom Fair, whereby the removal of these temporary buildings would not be necessary.
50. No meetings of the commission or executive committee were held between June 28, 1949, and November 11, 1949. During this period, Mr. McGarraghy, chairman of the executive committee, was gravely concerned as to the feasibility of putting on Freedom Fair, and as to the adequacy of existing enabling legislation for such a program. McGarraghy and other commission members were of the opinion that the commission should have independent legal counsel. Mc-Garraghy did not think he should personally express an opinion on these legal questions because he was a member of the commission. Additionally, by this time, architect Chatelain had made a claim to the executive committee that he had been unlawfully displaced as the official architect for the commission.
Members of the executive committee were not always informed by Boykin or Barron concerning actions that were taken by them regarding Freedom Fair. Shortly after the appropriation bill was passed by the Congress on October 14, 1949, McGarraghy attempted to arrange an executive committee meeting, but was told by Mr. Boykin that there was nothing to present to the executive committee on which it might take action^
*619 51. A meeting of the executive committee was held on November 17, 1949. In addition to other proposals either adopted or rejected by resolution, the executive committee unanimously passed a resolution designating Walter Bastían as general counsel for the commission. Mr. McGarraghy requested at this meeting that a report be prepared for submission at the next meeting of the executive committee, on December 2, 1949, of all commitments made by the director and the executive vice chairman in behalf of the commission.
52. At the meeting of the executive committee, on December 2,1949, three of the five committee members were present, namely, Messrs. McGarraghy, Fleming, and Young. Messrs. Boykin and Maybruck were also present by invitation. Several problems confronting the committee were disposed of by resolution. Mr. Barron’s report on commitments was presented with the various letters of intent. In addition to the letters of intent for Byrne and Gardner, there were similar letters to Kobert E. Fowler Associates, for public relations, publicity and advertising; Mr. Harold Schendell (the leasing bureau); Baltimore Contractors, Inc., for construction of Freedom Fair; and Milton E. Maybruck & Company as certified public accountants. The prior employment of Mr. Maybruck as Director, Finance and Audit Division, was ratified and approved by resolution of the executive committee. The committee members had not previously seen or heard of the letters of intent signed on behalf of the commission by Carter Barron and all were surprised that he had taken these steps without commission approval.
The minutes of this meeting pertaining to the committee’s actions on Mr. Barron’s report reveal the following:
Mr. Maybruck reported to the meeting that Mr. Barron, Mr. Boykin, he and other members of the staff were presently engaged in negotiating the proposed final definitive form of each of the agreements for which letters of intent had been issued by the Executive Vice Chairman. As soon as such agreements were complete they would be submitted to the Committee for its consideration.
In the course of discussion which ensued regarding Mr. Barron’s report it was acknowledged by the Committee that all of Mr. Barron’s actions were reasonable and in order and within the scope of his 'authority. *620 However, before approving the form of the final definitive agreements now being negotiated the Committee was of the opinion that such agreements should first be submitted to the Executive Committee and General Counsel for their respective approvals.
On motion by Commissioner Fleming, seconded by Commissioner Young and unanimously approved by all members present, it was
Resolved, That the engagement of Milton E. May-bruck as Director, Finance and Audit Division, be and the same hereby is ratified and approved subject to such terms and conditions as may be approved by the Executive Vice Chairman.
Chairman McGarraghy then suggested that the Committee give consideration to a formal operating procedure. He felt that adoption of such a formal operating procedure would enable the Committee to transact the business to be brought before it with greater dispatch, having in mind the fact that time was of the essence. He also felt that it was the duty of the Committee to review and approve all contract commitments. Commissioner Fleming stated he too felt such a procedure was desirable. After some discussion, Chairman McGarraghy suggested that Mr. Boykin prepare an outline of proposed procedure regarding operation of the Committee as well as delegation of authority to the Director and other members of the staff in order that the Committee would have a clear understanding of all matters on which it would pass directIy as well as those matters with reference to which they were delegating authority to act to the Director.
53. In writing the minutes referred to in the previous finding, Milton Maybruck. acting secretary of the executive committee, was uncertain as to the committee’s opinion concerning Carter Barron’s actions, as there was considerable dissension at the meeting. Mr. Maybruck believed, however, that Barron’s actions were validated and, therefore, included in the minutes the statement that it was acknowledged by the committee that “all of Mr. Barron’s actions were reasonable and in order and within the scope of his authority.” It appears clear from the testimony taken at the trial of these claims that the minutes, insofar as they pertain to Barron’s actions, are incorrect and at most merely reflect the opinion of Mr. Maybruck and a minority of the commissioners present. The majority of the commissioners *621 present at that meeting did not agree that Carter Barron acted within the scope of his authority in signing the letters of intent, but thought it was a function of the executive committee to approve such commitments. Additionally, these minutes and the minutes of the previous executive committee meeting were delayed, and were only made available to commission members in January 1950, following a written request for them from Mr. McGarraghy.
54. Neither the plaintiffs’ letters of intent nor their proposed contracts were approved or ratified by the executive committee at the December 2, 1949, meeting or at a prior or subsequent meeting of the executive committee or the commission.
55. At the next executive committee meeting, held on December 9, 1949, some of the details of the proposed contracts for plaintiffs and others receiving letters of intent were explained to the executive committee, but drafts of these proposed contracts were not made available to the committee at the meeting. Carter Barron stressed the necessity for approval of these contracts and requested authority to execute them, with GAO approval, in the general terms as outlined to the executive committee. The executive committee approved the proposed agreement with the leasing bureau and passed a resolution that the executive vice chairman was authorized to execute a contract with the leasing bureau. Action on all other contracts was deferred until another meeting of the executive committee which was to be held later.
56. At a subsequent meeting of the executive committee, held on December 16, 1949, Carter Barron again requested authority to execute the Gardner contract. No action was taken regarding this request.
It was mentioned at this meeting that Robert Ware Straus, Executive Secretary, Exhibit Builders Association of Metropolitan Washington, had complained to the executive committee and to the Antitrust Division of the Department of Justice that Gardner was to receive exclusive rights to design the Federal exhibits for Freedom Fair in violation of the law requiring competitive bidding. Mr. Boykin advised that he had personally discussed the matter *622 with Assistant Attorney General Bergson, who had advised him that to negotiate a contract for design of these exhibits did not violate the law. Thereupon, the executive committee resolved that Boykin advise Straus that the commission had committed itself to execution of a definitive contract for the exclusive design of Federal exhibits subject to approval by the appropriate Government agencies, but that construction of these exhibits would be opened to competitive bidding.
57. The executive committee decided to recommend to the commission at its next meeting, on December 30,1949, that the opening of Freedom Fair be postponed until April 1951. The executive committee released a statement to the press regarding the postponing of Freedom Fair, the pertinent portion of which follows:
Since the date of the appropriation for the Sesquicentennial making the Freedom Fair a possibility, every consideration has been given to meeting a time schedule which would assure opening the Fair on July 4, 1950.
Notwithstanding these efforts, delays have been encountered which make it impossible to complete the Fair on schedule and the Executive Committee will refer to the Commission the question of postponing opening of the Freedom Fair until the Spring of 1951.
The Committee also will recommend an organization and procedure to govern award of contracts and operation of the Fair.
In the meantime, instructions have been issued for the temporary curtailment of activities in connection with the Freedom Fair and review of existing commitments Upon completion of this review, all of the transactions will be made public, it being the opinion of the Executive Committee that all of these matters should be made public.
Plan A of the Sesquicentennial program will be executed as originally planned and will constitute a prologue to the Freedom Fair.
The executive committee determined that it should review all existing commitments and director Boykin was instructed to temporarily defer all work on Freedom Fair pending this review. Action on all commitments relating to Freedom *623 Fair was deferred pending the appointment of a general counsel.
58. At the January 6, 1950, meeting of tlie executive committee there was a lengthy discussion by all committee members regarding the past actions of the commission, the executive committee, Mr. Barron, director Boykin, and staff members. There was accord that it was necessary to have the general counsel’s opinion prior to approval of any further commitments on behalf of the commission with regard to Freedom Fair.
59. During the period following designation of Walter Bastian as general counsel, Carter Barron had strenuously objected to his appointment, had brought pressure on the committee opposing the appointment, and had instructed Boykin to oppose it. Barron explained to committee members that advice from his staff was sufficient. The executive committee, however, would not approve the various commitments made by Carter Barron without a review by the general counsel. The executive committee was not aware that Mr. Barron had been obtaining legal advice from Minor Hudson.
60. On January 3,1950, director Boykin sent the following letter to Byrne:
By order of the Executive Committee of this Commission, I am hereby notifying you to discontinue all plans and specifications that you have in work as a result of our Letter of Intent to you dated October 20,1949.
Byrne replied to this letter on January 5,1950, as follows:
We acknowledge receipt of your letter of January 3, 1950 instructing Byrne Organization, Inc. to discontinue further architectural and engineering work on the so-called Freedom Fair.
The Commission’s letter of intent of October 20,1949 to Byrne Organization, Inc. states that Byrne Organization, Inc. will be awarded a definitive contract for all the architectural, engineering and construction management phases of the said Fair and, as you know, the definitive contract, after many weeks of negotiation, now appears to be in a form acceptable to both parties and ready for execution. In fact, one reimbursement has already been made to Byrne in accordance with the provisions of the latest draft of the definitive contract.
*624 Because of the great magnitude of work so far accomplished and the need, therefore, for a definitive contract, we should like to suggest that such contract now be executed subject to a provision therein, if the Commission desires, that Byrne not perform further work thereunder until so instructed by the Commission.
Meantime, to discontinue the present work at once would involve the dismissal of many architects, engineers, draftsmen and technical men especially engaged to assist in completing the A. and E. phases of the Fair. It is, of course, necessary for us to comply with the prevailing custom and practice applicable to such professional and semiprofessional help to give them two weeks’ dismissal notice or equal pay in lieu thereof before terminating such personnel. Does the Commission wish us to give such two weeks’ notice now and gainfully employ such persons for two weeks more on the said A. and E. work rather than to terminate them at once with a result-tant difficulty in rehiring and assembling a competent group now familiar with the program, allowing them two weeks’ pay as a reimbursable expense to the Contractor by the Commission?
Your further interpretation of the Commission’s wishes with respect to discontinuance of work is respectfully solicited at the earliest practicable moment.
61. Mr. Byrne and Minor Hudson went to Florida on January 4,1950, where Carter Barron was recuperating from an illness, for the purpose of having him confirm all commitments publicly, sign all contracts, and rescind the stop orders.
On January 16, 1950, Byrne again wrote in reply to the commission’s letter of J anuary 3, 1950, requesting additional clarification as to the status of employees and also instructions regarding cancellation of subcontracts. Byrne pointed out it had transferred as many employees as possible to other work and had given the balance two weeks’ notice, and desired specific information as to the commission’s wishes so that the discharge notices might be cancelled if such action was desired.
Director Boykin replied to Byrne’s inquiry on J anuary 17, 1950, as follows :
In reply to your letter of January 16, our letter of J anuary 3 addressed to your organization was clear and explicit. We presume you have already acted in accordance with it and failure to have done so will, of course, be your own responsibility.
*625 62. On January 4,1950, director Boykin sent the following letter to Gardner:
Acting under instructions from the Executive Committee of this Commission, I am hereby notifying you to hold up any further plans, designs, or specifications on which you may be engaged as a result of a Letter of Intent from this Commission dated October 20,1949.
Gardner replied to these instructions by letter dated J anuary 5.1950, as follows:
I have just received your letter of J anuary 4th notifying us to “hold up any further plans, designs or specification.”
Would it be possible for you to get a clarification from the Executive Committee on this order? As you know, we have engaged a number of artists, engineers and draftsmen to accomplish the work outlined in our Letter of Intent dated October 20, 1949. To dismiss these men would constitute a real hardship not only to them but to the success of the venture on which we are working. Is it the desire of the Executive Committee that we keep these men on the payroll pending some further decision?
I am also interested in having further clarification of this order on another point. Shall we cancel the appointments we have with coordinators and expeditors of the various departmental and independent agencies who are currently assimilating information from which our artists and designers can work ?
I would appreciate clarification of these problems as quickly as possible.
Director Boykin replied to Gardner by letter dated January 9.1950, as follows:
With reference to your letter dated January 5, 1950, the letter of intent obligates the government to compensate you for your services and those of your organization at such time as a definitive contract is executed between the United States of America, acting through the National Capital Sesquicentennial Commission, and Gardner Displays of New York, Inc.
As I understand the matter, negotiations are under way at the present time providing for the execution of a fixed price contract, which sum when paid to Gardner Displays for its services, would be in full compensation for any and all claims Gardner Displays might have *626 against the United States, including those arising under the letter of intent to which you refer.
63. Walter Bastian accepted the invitation to act as general counsel for the commission, reviewed the various commitments, proposed contracts, and other details relating to the sesquicentennial celebration, and made a preliminary written report to the executive commitee at a meeting held on J anuary 13,1950.
Mr. Bastian recommended that Plan A be carried forward with dispatch. Regarding incorporation of Freedom Fair, Mr. Bastian found that there was inadequate legislation, in that there was no authority to form a private nonprofit corporation or to issue bonds or debentures secured by pledging anticipated revenues, which would be necessary in order to properly establish the Fair. He was also of the opinion that inadequate funds had been appropriated by the Congress to assure success of Freedom Fair, since Section 3733 of the Revised Statutes apparently required that every cent necessary for erection of the buildings must be in the Treasury before construction could begin. This statute reads as follows:
No contract shall be entered into for the erection, repair, or furnishing of any public building, or for any pubfic improvement which shall bind the Government to pay a larger sum of money than the amount in the Treasury appropriated for the specific purpose.
Additionally, Mr. Bastian advised that the commission was not yet assured of the proposed site for the erection of Freedom Fair.
64. Included among the matters concerning which Mr. Bastian was not prepared to give his opinion was the legal validity of the letters of intent, including those given plaintiffs herein. He wished to defer action on that subject until he had an opportunity to discuss it with Carter Barron, who was then in Florida. Bastian had “grave doubts as to any liability” of the commission, but felt the commission should consider the possibility that some liability might flow from these commitments. He was not prepared to furnish the commission with the possible extent of this liability.
*627 65. Mr. Bastían recommended that nothing further be done to change the status quo with regard to any of the agreements, commitments, or letters of intent pending a further meeting of the committee and/or the commission, and pending the return of Carter Barron. Director Boykin was thereafter given instructions that no further payments were to be made to Byrne or Gardner pending further action of the committee.
66. On March 1,1950, pursuant to a previous recommendation of the executive committee, Carter Barron was authorized to contact Paul Massman of Chicago, to be employed as general manager of Freedom Fair, for the purpose of further exploring the feasibility of having the fair.
Mr. Massman was thereafter employed, and immediately abandoned the concept of Freedom Fair with the “U”, “S”, and “A” shaped buildings, as had been presented and worked on by plaintiffs. His idea was to have a more compact fair in a smaller area but with an entirely different type of construction and plan which would more than double the amount of industrial space to be leased. The total cost of this revised plan was estimated to be $24,723,750.
67. Possible sites for the proposed change in the fair plan included Bolling Field, the National Training School for Boys, and that part of the Anacostia Park site which contained no temporary buildings. The Bolling Field site was abandoned because the Air Force wanted too much money from the commission to move its facilities to Andrews Field. Mr. Massman believed that the National Training School site was too hilly for a fair. Although that portion of the Anacostia Park site which contained no temporary buildings was considered the best site, no final agreement as to a site was every arrived at or approved prior to abandonment of the plan for Freedom Fair.
68. Plaintiffs performed some additional services in connection with the new design for Freedom Fair. These services included sketches of the new design and estimated costs.
69. On March 1, 1950, general counsel Bastían recommended that an opinion be obtained from the Attorney General with respect to the authority of the commission to *628 grant to a nonprofit corporation the rights and privileges necessary to enable such corporation to build and operate Freedom Fair. A request for the Attorney General’s opinion was made by letter dated March 9, 1950. The commission and the executive committee were unaware that the Department of Justice had previously furnished Minor Hudson with its opinion on the same question on November 23, 1949, in response to a similar request.
By letter dated May 4,1950, the Attorney General advised the commission of the previous inquiry on this matter and reiterated that the Department of Justice was of the same opinion previously indicated, namely, that the commission did not have authority to form such a corporation unless specifically authorized'by Congress to do so.
70. In view of the opinion of the Attorney General, the executive committee, at a meeting held on May 10, 1950, approved a recommendation to the full commission that plans for Freedom Fair be abandoned.
At the next meeting of the full commission, held on June 1, 1950, the plan to hold Freedom Fair was abandoned by the commission.
71. Plaintiffs submitted their claims to the commission following abandonment of the proposed Freedom Fair. These claims were audited by commission accountants, and the commission made recommendations to the General Accounting Office that claimants be allowed reasonable out-of-pocket expenses connected with ascertaining the feasibility of Freedom Fair as well as a reasonable percentage of profit.
72. Based on the audit reports of the commission, the G.A.O. issued a settlement of claim notice on September 9.1952, allowing Byrne the sum of $5,814.94; and on October 20.1952, issued a settlement of claim notice allowing Gardner $4,138.46 for expenses incurred between October 20, 1949, the date of the letters of intent, and January 6, 1950, and for a reasonable profit therewith.
73. Plaintiffs rejected the settlements, returned the settlement checks to G.A.O., and on June 26,1953, both plaintiffs filed their petitions in this Court.
*629 DAMAGES

The Byrne claim,

74. Byrne makes no claim for services rendered prior to the date of the letter of intent of October 20, 1949. Work performed prior to this time admittedly was volunteered by Byrne with the hope of obtaining a contract at some future date.
75. Byrne bases its claim on the letter of intent which was received and upon the terms of an -unexecuted contract which reads, in pertinent part, as follows:
ARCHRECTORAL-ENGJNEERING-MANAGEMENT CONTRACT
THIS ARCHITECTURAL-ENGINEERING-MANAGEMENT SERVICES CONTRACT, made and entered into at Washington, District of Columbia, this-of-, 1950 by and between NATIONAL CAPITAL SESQUICENTENNIAL COMMISSION, hereinafter referred to as the Commission, and BYRNE ORGANIZATION, INC. a Delaware Corporation, having its principal business office at 2607 Connecticut Avenue N.W., Washington, D.C., hereinafter referred to as Byrne.
* * * * *
ARTICLE H
REIMBURSEMENT AND EEE
A. Reimbursable Costs
Byrne shall be reimbursed monthly for all expenditures in performance of the work including the following;
1. Labor — for the time actually devoted to work hereunder either at Byrne’s office or the site of the “Fair”, Byrne’s employees shall be compensated at the hourly wage rates listed opposite each job description as set out in Exhibit “C”, attached hereto and made a part hereof. No reimbursement shall be allowed for the following officers of Byrne unless specifically aproved by the Commission: President, Vice Presidents, Treasurer, Secretary or Controller.
2. Other Items — all materials, tools, supplies, blueprints, and reproductions of plans, designs and specifications, necessary for the fulfillment of Byrne’s work hereunder, and including motor vehicles for field supervis *630 ing, engineers and inspectors, as authorized by the Commission.
3. Transportation — travel expenses, and subsistence on travel as authorized by the Commission.
4. Losses or expenses not compensated by insurance or otherwise (including settlements made with, the written consent of the Commission) actually sustained by Byrne in connection with the work and found and certified by the Commission to be just and reasonable, unless reimbursement therefor is expressly prohibited, provided that such reimbursement shall not include.any amount for which Byrne would have been indemnified or compensated by insurance in accordance with the requirements of the Commission and any and all. other miscellaneous direct expenses of Byrne for this job.
All non-expendable items purchased under this section as a reimbursable shall, at the termination of this contract, be turned over to the Commission for disposal at the direction of the Commission.
Byrne will invoice the Commission on or before the fifth (5th) day of each calendar month for such of the aforesaid reimbursable items as fall within the preceding calendar month and the Commission will pay Byrne therefor within five (5) days after the receipt of such invoice. The Commission may examine at any reasonable time any and all records of Byrne pertinent to this contract to verify cost data.
B. Fee.
The Commission shall pay Byrne a fee of Two Hundred Thirty-Eight Thousand, Three Hundred Seventy-One ($238,.371.00) Dollars based on a total estimated construction cost of Ten Million, Five Hundred Ninety-Four Thousand, Three Hundred Eleven ($10,-594,311,000 [sic]) Dollars for the “Freedom Fair” as set forth in Exhibit “B”, which estimated cost as set forth in Exhibit “B” shall, for the purpose of determining Byrne’s fee or subsequently modifying the same under this contract, be deemed to be controlling even though the actual construction cost may vary from the amounts set forth in Exhibit “B”. If there is a reduction in the scope of the work as refected in Exhibit “B”, but not a complete termination as provided for by Article VIII below, Byrne’s fee shall be reduced to the extent of two and one-quarter (2-%%) percent of the estimates of the items shown on Exhibit “B”, which may be eliminated, but in any event the total fee shall not be reduced below One Hundred Ninety Thousand ($190,000.00) Dollars because of the fact that Byrne will immediately *631 be required to begin its technical, architectural and engineering work on some phases of all of the items set forth in Exhibit “B” so that the “Fair” can be completed by the earliest possible date. If the Commission should direct Byrne to perform work as defined hereunder on further items in addition to those now reflected in Exhibit “B”, Byrne agrees to perform such additional work for the Commission according to the terms of this contract but for a fee equal to only two (2%) percent of the amount which the Commission and Byrne may agree to be the estimated construction cost, in which "event Exhibit “B” shall be amended to include such additional items. The fees to be paid to Byrne by the Commission shall be paid monthly at the same time as the Commission pays Byrne’s invoices aforesaid as follows: Seventy-five Thousand ($75,000.00) Dollars in February, 1950, and Twenty-five Thousand ($25,000.00) Dollars monthly thereafter beginning with March, 1950, and continuing through to and including August, 1950, less ten (10%) percent of each fee installment to be retained and withheld by the Commission until the final completion of the “Freedom Fair” to insure Byrne’s continuing to render archictectural [sic], engineering and other technical services of a supervisory and inspection nature until the completion of the “Fair”. The entire balance of the total fee due Byrne will in any event be paid no later than thirty (30) days after the acceptable completion of the entire “Fair”.
Byrne shall set up an accounting staff familiar with General Accounting Office procedure to maintain all necessary financial records for the prosecution of the project and the inspection of the Commission and shall audit all vouchers, invoices and requests for reimbursement submitted for payment to the Commission under the scope of the work outlined in this contract. The cost of the above staff is to be included as reimbursable under Article II, A. 1.
*****
ARTICLE VIH
TERMINATION OE CONTRACT BY COMMISSION
A. Should Byrne at any time refuse or fail to perform the duties and functions here assumed with promptness and diligence due to causes within its control or fail to perform any of its other obligations under this contract, the Commission may terminate Byrne’s right to proceed with the work by written notice to Byrne.
*632 B. Should conditions arise which in the opinion of the Commission make it advisable or necessary in its interests to permanently discontinue the construction of the “Freedom Fair”, the Commission may instruct Byrne to terminate its current work and/or subcontracts by written notice to Byrne to do so. Such termination shall be effective in the manner specified in such notice.
C. On receipt of such termination instructions, Byrne shall, unless the notice directs otherwise, immediately proceed to wind up its work or the placing of orders for materials, facilities, and supplies in connection with the project, and shall if requested make, every reasonable effort to procure cancellation of all existing orders, contracts or subcontracts upon terms satisfactory to the Commission.
D. Upon such termination, full and complete settlement of all claims of Byrne or arising out of this contract shall be made as follows:
1. The Commission will assume and become liable for all obligations, commitments and claims that Byrne may have theretofore in good faith undertaken or incurred in connection with said work and in accordance with the provisions of this contract, and Byrne, as a condition of receiving the payments mentioned in this Article, shall execute and deliver all such papers and take such steps as the Commission may require for the purpose of fully vesting in the Commission the rights and benefits of
Byrne under such obligations.and commitments.
2. The Commission will reimburse Byrne for all expenditures made in connection with tins contract and chargeable hereunder as were not previously reimbursed.
3. If such termination is due to any substantial fault or omission of Byrne, no additional payment on account of the fee will be made. If such termination is not due to any substantial fault or omission of Byrne, Byrne will be paid the following, minimum fees, according to the month in which termination notice may be given Byrne by the Commission:
February 1950 — $125,000.00
March 1950 — $160,000.00
and thereafter the fee will be a pro-rata proportion of the entire fee provided hereinbefore, based on the amount of work completed at the time of the termination applied to the prescribed fee set forth hereinbefore, but in any event, not less than a minimum of $190,000.00.
*633 ARTICLE XIV
LETTER OF INTENT
The aforementioned Letter of Intent and all rights and obligations of the parties hereto thereunder are superseded by and merged into this contract. All payments made by the Commission under said Letter of Intent and all obligations incurred by the contractor under said Letter of Intent shall be deemed to have been made under this contract.
76. Byrne received three payments from the commission totaling $35,119-83. These payments were as follows:
1. On December 30, 1949, Byrne was paid $8,091.03 which represented two bi-weekly payrolls plus an allowance for overhead, which was allowed in full by the G.A.O. subject to recoupment of any overpayment of overhead by the commission when an agreement was reached between the parties as to actual overhead expenses. Inasmuch as it was represented to G.A.Q. that an amount substantially in excess of $8,091.03 was due to Byrne from the commission, the G.A.O. did not further question this voucher. Neither the minutes of the executive committee nor those of the commission contain any indication of a discussion or approval of this voucher.
2. On February 25,1950, Byrne was paid $20,025.72, which sum represented a partial payment of a voucher totaling $32,065.66. This payment was made with the executive committee’s approval and with the understanding that it in no way affected the rights of either party nor was it to be construed as an admission or denial of responsibility by either party.
3. On April 21, 1950, Byrne was paid $7,003.08, with the executive committee’s approval, subject to the same conditions covering the second payment.
77. Byrne’s records were divided into those expenses directly chargeable to each project, such as Freedom Fair, and home office expenses which were attributable to all of Byrne’s projects. Byrne’s claim was audited by the commission accountants who examined all vouchers and other records supporting Byrne’s claim. These auditors eliminated some expenses not considered properly attributable to *634 this claim or which were not supported by Byrne’s records, but they were liberal in allowing entertainment expenses which are not generally allowed under Government contracts. The commission accountants also allowed a direct charge of rent to the Freedom Fair account of $250 per month through March 1950 and allowed payroll expenses through May 31, 1950, in computing the total allowance for this claim.
78. Items which the commission did not allow, but which could properly have been allowed, include direct payroll taxes and the salary of I. A. Bickelhaupt from November 22,1949 (ll/s months at $1,250 per month in 1949, and $576.80 during 1950). Although normally officers’ salaries are a home office expense considered as overhead, Byrne received specific permission from Boykin and Maybruck to have Mr. Bickel-haupt’s salary paid entirely by the commission, since he had been designated project manager.
79. Byrne’s total overall costs for all projects between October 20,1949, and May 31, 1950, were $483,278.[1] Byrne’s overhead expenses for its home office were $55,007.38 during this period. Direct costs of Freedom Fair were $39,398.61. Thus, 11.38 percent of such costs were for overhead expenses. The pro rata amount of overhead expense chargeable to Freedom Fair is 11.38 percent of $39,398.61, which is $4,483.56.[2]
80. The following is a schedule of Byrne’s costs in connection with Freedom Fair:
Amount Claimed Amount as Com-for Costs puted herein
Direct Expenses_ $8,425.33 $3,345.49
Direct Salaries_ 29,921.30 29, 050.04
Subcontracts_ 7, 003. 09 7,003.08
Overhead Expense. 29,106.88 4,483.56
Total Costs_ 74,456.60 43,882.17
*635 81. Byrne claims a fee of $190,000 in addition to its costs as provided in the proposed contract which was never executed (Article VIII, D, 3 — Termination of Contract by Commission). The commission recommended an allowance of 3 percent profit on Byrne’s total costs, which was approved by the G.A.O. This percentage would be equivalent to $1,316.47, making total expenses and profit of $45,198.64. Since $35,119.83 has already been paid to Byrne by the commission, the sum of $10,078.81 would be due Byrne under this method of computing the claim.
Should the Court allow Byrne a fee of $190,000 as claimed, total costs plus fee would be $233,882.17. Since the commission has paid Byrne $35,119.83, the sum of $198,762.34 would then be due on account.

Defendant's counterclaim, on Byrne’s claim

82. Defendant, in its first counterclaim, alleges that payments were made to Byrne under the mistaken belief that the commission had authorized these payments pursuant to Byrne’s letter of intent, whereas the letter of intent was not authorized by either the commission or the executive committee of the commission. Defendant also alleges that Byrne is not entitled to judgment in any amount, since Carter Barron had no authority to obligate the commission by issuing the letter of intent, and that defendant is entitled to recover the $35,119.83 paid Byrne.
83. Defendant claims, in its second counterclaim, that, should the Court find the letter of intent to be valid, it would become effective only on November 23, 1949, the date it allegedly was signed and delivered to Byrne.
Should the Court so find, an. amount of approximately $6,484.89[3] should be deducted from the amount due the plaintiff Byrne, and if this amount is greater than the amount *636 found to be due Byrne, the remainder would be recoverable by defendant.

The Gardner claim,

84. Gardner bases its claim on a letter of intent dated October.20, 1949 (finding 40), and upon the terms of an unexecuted proposed contract which reads, in pertinent part, as follows:
ARTICLE I
(design supervision)
A. The Commission does hereby appoint Gardner the official designer for the overall concept of Freedom Fair and the supervisor of all federal exhibits, displays, demonstrations and illustrations in the Freedom Fair, and incident thereto does reaffirm its adoption of the plan for the Freedom Fair designed, copyrighted and owned by Gardner, and which by these presents is hereby irrevocably and fully assigned by Gardner to the Commission, including all plans, designs, copyrights, trade marks and property rights in the idea, name, symbols, identifying data, building layouts, schemes and plans. * * * * #
ARTICLE H
(design oe government exhibits)
A. The Commission does hereby employ Gardner in capacity as official designers for the Commission of all exhibits for the departments, independent offices and establishments of the Federal Government and for the government of the District of Columbia, not to exceed exhibits to fill 25 spaces of - square feet each; PROVIDED, however, that the design of the exhibit for each Federal department, agency or office, or the District of Columbia government, shall be approved in advance by such Federal department, agency or office, or the District of Columbia government in the manner herein provided.
B. Within 120 days of notice to Garder [sic] from the Commission to proceed with the design of each Federal Government exhibit, Gardner will complete preliminary sketches, outline specifications and prepare cost estimates for each such exhibit and submit same to the agency or department involved and/or to the Commission as it may direct. The Federal Government and District of Columbia Government exhibits shall be so designed that the total construction cost estimates on all such exhibits shall not exceed $1,500,000.00.
*637 Within-days of the receipt by the Commission of preliminary sketches, etc., as provided above for each exhibit the Commission will notify Gardner of final approval, rejection or requested changes. * * *
* * * * *
ARTICLE YHI
(TERMINATION)
A. The Commission may terminate this contract at any time the Commission determines to abandon plans for Freedom Fair by a notice in writing from the Commission to Gardner, Upon receipt of such notice Gardner shall, unless the notice directs otherwise, immediately discontinue all work.
B. If the contract is terminated for the convenience of the Commission, and such termination occurs on or before December 10,1949, then all payments to Gardner provided for herein will be made promptly for that proportion of the services required under the contract which the work actually performed bears to the total work required under the contract. If such termination occurs later than December 10, 1949, then the fee of $50,000 [sic] provided for work required under Article I hereof shall be considered and treated as having been earned in full by Gardner, and shall be paid to Gardner promptly; and as to the $150,000 fee provided for work required under Article II of the contract, payment shall promptly be made for that proportion of the services required under Article II which the work actually performed thereunder bears to the total work required thereunder, less any payments previously made therefor.
* # * * #
ARTICLE IX
(LETTER OF INTENT)
The aforementioned Letter of Intent, Exhibit “A”, and all rights and obligations qf the parties hereto thereunder are superseded by and merged into this contract. All payments made by the Government under said Letter of Intent and all obligations incurred by the Contractor under said Letter of Intent shall be deemed to have been made under this contract.
85. The proposed contract specified a fee of $50,000 for the overall concept of Freedom Fair and $150,000 for the design of the Federal Government exhibits. However, George M. Rowland, Jr., formerly general manager of *638 plaintiff Gardner’s New York operation, testified tliat, on or about December 23, 1949, Gardner agreed to reduce its fee for the design of the Federal exhibits from $150,000 to $50,000, thereby making a total price of $100,000 for these two major items. The budget for the Federal Government exhibits had been drastically reduced at about this time and Carter Barron requested that Gardner reduce its fee.
86. Gardner claims the full $50,000 fee for the overall concept of Freedom Fair and contends that 70 percent of the design of Federal Government exhibits was completed and, therefore, claims $35,000 for this work. In addition, Gardner’s claim includes $1,000 for accounting costs incurred in preparing its termination claim for the G.A.O., and $4,500 in attorney fees in connection with the prosecution of this claim, making a total claim of $90,500.
87. Gardner submitted a statement of costs incurred in connection with Freedom Fair for the period from September 7, 1948, to June 1, 1950, totaling $96,117.58. This was submitted as an alternate basis for payment of the claim.
Gardner performed a substantial portion of its services for the Commission prior to receipt of its letter of intent dated October 20, 1949, and contends it should be entitled to compensation for this work.
Defendant contends that if plaintiff Gardner is entitled to any amount it would be for work performed after receipt of the letter of intent and until it was instructed to hold up work on Freedom Fair by letter dated January 4,1950. Defendant further emphasizes that the services performed prior to October 20, 1949, and subsequent to January 6,1950, were performed on a voluntary basis.
88. The record supports a finding that Gardner volunteered its services prior to October 20, 1949, in the hope of obtaining a contract when Air if an appropriation was obtained from the Congress to finance the proposed sesquicentennial celebration.
89. The commission’s auditors examined Gardner’s claim and its books and records supporting the claim. The commission recommended exemption from this claim of all expenses prior to October 20, 1949, and subsequent to January 6, 1950, and also eliminated those expenses claimed which were not properly attributable to this claim or not supported *639 by Gardner’s records. This decision of the commission appears reasonable under all the circumstances involved.
90. Items exempted from Gardner’s claim by the commission which could have reasonably been included are as follows:
1. The salary and traveling expense of Lowell Brown totaling $127 for work exclusively on Freedom Fair was a direct charge to this project.
2. The item of $100.14 for the Chastleton Hotel expenses in Washington, D. C., used exclusively in connection with the fair operations, was properly chargeable to this project.
3. The accounting fee of $1,000 for the preparation of this claim for the G.A.O. upon termination is an item normally reimbursed in connection with the termination of Government contracts.
91. Gardner’s total direct costs for all projects (including those involved in this suit) during the period from November 1,1948, to May 31,1950, were $442,068.36. Its overhead expenses for this period were $43,430.65. Thus the ratio of Gardner’s overhead expenses to its direct costs was 9.82 percent.[4]
92. The following is a schedule of Gardner’s costs in connection with Freedom Fair for the period from October 20,
1949, to January 7,1950:

Item Amount

Salaries_$3,028. 37
Travel Expenses_ 314. 08
Service Charges_ 94.03
Total Direct costs_ 3,436.48
Overhead 9.82 percent_ 337.46
Total Costs of Operation- 3, 773.94
Accounting fee in preparing claim- 1, 000.00
Total Costs Incurred_ 4,773. 94
*640 During the period from January 8,1950, through May 31, 1950, Gardner incurred $822.66 in additional expenses, which are deemed to be properly chargeable to the Freedom Fair project should this plaintiff be given an award under its claim.
93. The commission recommended, and the G.A.O. approved, a profit of 15.8 percent of total operating costs for the period from October 20, 1949, to January 7, 1950. This would amount to $596.28. This profit was based on the ratio of Gardner’s gross profit to net sales for the period from November 1, 1948, through May 31, 1950, and represents profit before charges of administrative overhead.
94. The defendant alleges that neither the letter of intent nor the proposed contract on which Gardner bases its claim is legal or valid. Defendant contends Gardner is not entitled to judgment in any amount, since Carter Barron had no authority to obligate the commission by the issuance of the letter of intent; and that neither this letter nor the contract was ratified or approved by the commission or its executive committee. It is established by the record that no formal contract was ever negotiated between the parties.
95. It is admitted by both parties that the overall concept of Freedom Fair, for which plaintiff claims a $50,000 fee, was completed prior to the receipt by Gardner of the letter from the commission halting work on this project. The concept was substantially completed prior to receipt of the letter of intent dated October 20,1949.
96. Gardner also claims a $35,000 fee for the completion of an estimated 70 percent of the design of Federal exhibits, for which the proposed fee for the completed exhibits was to have been $50,000.
No satisfactory evidence has been presented on the basis of which the proportion of work completed with regard to the designs of the Federal exhibits for Freedom Fair can be computed.[5]
*641 CONCLUSION OP LAW
Upon tb.e foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and their petitions are therefore dismissed.
The court further concludes as a matter of law that the defendant is not entitled to recover and, accordingly, its counterclaim is dismissed.

 The amount of $483,278 was obtained from defendant’s exhibit 6, summary of audit, pages 1 to 36, which was described as “total volume” and was assumed to be total costs of all projects and was so used. Defendant’s accountant also used this figure for the same purpose.

 Plaintiff Byrne arbitrarily charged 50 percent of claimed overhead expenses to the sesquicentennial project for the period October 20, 1949, to December 31, 1949, and charged 25 percent of claimed overhead expenses to this project for the period from January 1, 1950, to May 31, 1950. Byrne’s claim amounted to 50 percent of $34,240.59 during. 1949, which equals $17,120.30, and 25 percent of $47,946.29, which equals $11,986.58. These two sums amount to $29,106.88 for both periods (finding 80).

 The evidence submitted was Insufficient to make a completely accurate determination of expenses from October 20, 1949, to November 23, 1949. The above computation was determined as follows: Adjusted direct payroll prior to November 23, 1949, was $3,613.76; subcontracts prior to this time totaled $1,129.15; known direct expenses prior to November 23, 1949, were $600.49. Three-sevenths of the remaining direct expenses, totaling $1,117.46 for the period between October 20, 1949, and December 31. 1949, were allocated In making this computation. Additionally, overhead of 11.38 percent of these direct costs was added to arrive at the amount shown.

 Computation of total direct costs for all projects for Gardner is as follows:
Total sales-$525,157.19
Gross profit on all projects___ 83,088. 83
Total costs aU projects_ 442,008. 36
Adjusted overhead from defendant’s exhibit 107, pages 4^-1 and 4-8, is $43,430.65, which is 9.82 percent of $442,068.36.

 Defendant disputes that 70 percent of the work was actually completed, but presented no evidence regarding this phase of the claim other than through cross-examination of witnesses.
The proposed contract and letter of intent called for advance approval by the various Government agencies as weU as final approval of the preliminary sketches and specifications, including cost estimates. Gardner produced no *641 evidence of advance or final approval by any of the various Government agencies of any designs or sketches prepared by it.
If Gardner started work immediately on October 20, 1949, and stopped after receipt of the letter dated January 4, 1950, it would have performed about 75 days’ work. There would remain a total of about 120 days’ work, which would indicate that approximately 38.46 percent of Its work was completed by January 5,1050.